SHELTON v. UNITED STATES.

No. 14360.

United States Court of Appeals
Fifth Circuit.

July 10, 1953.

Jay Paul Shelton, in pro. per.

Richard C. Baldwin, Asst. U. S. Atty., New Orleans, La., John N. McKay, U. S. Atty., and G. Harrison Scott, Asst. U. S. Atty., New Orleans, La., for appellee.

Before HUTCHESON, Chief Judge, and RUSSELL and STRUM, Circuit Judges.

HUTCHESON, Chief Judge.

Defendant was charged under section 2312, Title 18, U.S.C.A., with transporting in interstate commerce a described motor vehicle, knowing the same to have been stolen. After a lengthy trial to a jury, in which, pursuant to his insistence that he be allowed to do so, he conducted his own defense in an exceedingly capable fashion, he was found guilty.

Sentenced to serve four years and appealing in *forma pauperis,* he is here in *propria persona,* by oral argument and with a typewritten brief of more than one hundred pages carefully prepared, precisely documented to the record, and citing many cases. Presenting many grounds or points of error, twenty to be exact,[1] appellant

1. As appellant states the points, they are:
    (1) The court erred in denying motion to suppress evidence.
    (A) Appellant had standing to complain of the seizure of the car.
    (B) There was no probable cause for arrest or seizure.
    (C) The federal exclusionary rule was applicable.
    (2) Appellant was denied a speedy trial.

seeks a reversal of his conviction and sentence.

(A) The situation with regard to the El Paso "evidence" was not valid ground for ordering an indefinite continuance May 7, 1952.

(B) Appellant's failure to file a motion to subpoena witnesses prior to May 7 was no valid ground for cancelling May 12 trial date.

(C) The remote possibility (which never materialized) of a temporary lack of funds for witnesses was not a valid ground for cancelling the June 16 trial date.

(D) The *real* reason for continuances was laches of the prosecution.

(3) Appellant was denied the assistance of counsel.

(4) The court erred in calling jury's attention to appellant's failure to take the witness stand.

(5) Appellant was deprived of a fair trial by prejudicial newspaper publicity, and the parading of 68 "Witnesses", who never testified before the jury for three days.

(A) The fact that the prosecutor instigated the publicity magnifies the error.

(B) Although jail rules denied appellant access to newspapers, and thereby prevented him from obtaining exhibits showing extent of the publicity, the record nevertheless shows that appellant was prejudiced.

(C) The 68 supernumerary "witnesses" egregiously complemented the publicity.

(D) The error is magnified because the published material, and the psychological "testimony" of the 68 silent "witnesses" never became part of the trial evidence.

(E) Appellant's failure to exhaustively interrogate the jury on their voir dire, and failure to exhaust his peremptory challenges, does not make this appeal stand any worse.

(F) The prejudicial effect of the publicity and the 68 silent witnesses was not cured, and was incapable of being cured, by cautionary instructions.

(G) A conviction tainted by prejudicial publicity cannot stand.

(H) Since the Court failed to use "the best means available" to protect appellant from prejudicial effect of publicity and the parage of 68 silent "witnesses", the conviction must be reversed.

(6) The court's refusal to place jury in charge of a specially sworn or specially instructed bailiff was reversible error.

(7) Appellant was deprived of the right to have witnesses in his own behalf.

(A) The Court erred in denying motion to subpoena Helen McDowell.

Many of these points or grounds have little of substance in them, indeed are whol-

(B) The Court erred in denying appellant's motion to confer with an impartial handwriting expert, and to make available to such expert various disputed writings and specimens for comparison purposes.

(C) The Court erred in denying motion to subpoena Joseph Eatman.

(D) The Court erred in denying motion to subpoena F. B. I. Agents O'Leary and Walsh.

(E) The Court erred in threatening defense witnesses, before they testified, with grand jury investigation for perjury; the calculated effect of such threat being to deny appellant the effective exercise of his constitutional right to have witnesses in his own behalf.

(F) The Court erred in denying appellant's motion to interview government witnesses before they were excused.

(8) The Court erred in the exclusion of evidence and in refusing to allow the exhibits to be taken by the jury to the jury room.

(A) The Court erred in excluding two live dogs, and photographs of dogs, from the jury's view.

(B) The Court erred in excluding testimony of Frank Shelton on redirect examination as to why the FBI visited him.

(C) The Court erred in denying motion to permit the jury to take the exhibits to the jury room.

(9) The court erred in admitting evidence tending to connect appellant with the attempted sale of a stolen 1950 Ford.

(10) The court erred in admitting testimony relating to appellant's alleged statements and conduct while under illegal detention.

(11) The court erred in permitting defense witnesses to be questioned as to whether they had testified for the appellant in other cases.

(12) The court erred in admitting handwriting evidence.

(A) No proper foundation was laid for admission of the Vulcan Motel registration card.

(B) The handwritten motions used as standards of comparison were not in the "admitted or proved" handwriting of the appellant.

(C) Under the peculiar circumstances of this case, the use of the handwritten motions constituted compulsory self-incrimination.

(D) The handwriting evidence was admitted in violation of a binding stipulation and took appellant by surprise; and was improper rebuttal evidence.

ly lacking in merit, and could and would ordinarily be disposed of summarily and without individual comment. Because, however, appellant is his own counsel, and has discussed each point in his brief, we shall do likewise. We shall, though, in the interest of a more orderly discussion arrange the points or grounds in a sequence of our own, discussing first the least, and last the most, debatable of them.

Before proceeding to a discussion of the points which charge the commission of errors in the course of, or affecting, the trial, a brief general statement in regard to the proceedings had below will be in order as background for the discussion and determination of whether there was error in respect of any of the matters complained of. It will serve too, if there was error, in determining whether it was harmless[2] or reversible, that is whether it resulted in such prejudice to the substantial rights of the defendant as to require that the judgment be reversed.

On September 29, 1950, three members of the New Orleans Police Department, after questioning one Reed with regard to the price at which he would sell a 1950 Ford Convertible he was trying to sell and his naming a price which they thought was extremely low, proceeded to follow him as he continued visiting used car lots, and shortly thereafter they noticed appellant driving a 1949 Chevrolet following Reed and the Ford. Later both appellant and Reed were placed under arrest and held by the local authorities for approximately seventy-two hours and then released. A few hours afterward, information that both automobiles had been stolen was received, and a complaint was filed in the Eastern District of Louisiana against appellant, charging him with transportation of the Chevrolet.

Arrested in El Paso, Texas, on January 8, 1952, he was removed to that district for trial. Prior thereto, and proceeding as a pauper and as his own attorney, having in open court and in writing waived the assistance of counsel, appellant filed and argued before Judge Christenberry, according to the government's count some sixty-five, and according to his own, some twenty-eight motions. We have not thought it necessary to resolve the conflict.

On July 2, 1952, when the cause had been set for trial on July 21, 1952, appellant filed a motion to recuse Judge Christenberry on the ground of bias and prejudice, and Judge Wright, a district judge for the same district, conducted the trial, which proceeded as scheduled on July 21, 1952.

In support of its case, the government offered as witnesses: the three members of the New Orleans Police Department, who testified as to the circumstances surrounding appellant's arrest; William A. Reed, who testified in great detail on direct and cross examination as to his longstanding acquaintance and connection with appellant, and that he and appellant had registered at the Vulcan Motel on the outskirts of Birmingham, Alabama, on September 26th or 27th, 1950, the appellant registering them, that they had stolen the Chevrolet at Birmingham, had changed the license plates, and had then come together to New Orleans, Reed driving a 1950 Ford and ap-

---

(13) The court erred in denying motion to dismiss indictment.

(14) The court erred in failing to charge the jury as requested.

(15) The court erred in denying appellant the right to be present, as his own attorney, at every stage of the proceeding.

(16) The court erred in refusing to rule on motion to subpoena witnesses until conclusion of government's case in chief.

(17) The court erred in denying appellant's motion to inspect Reed's written statement of May 1, 1952.

(18) The court was without jurisdiction because the indictment was not "Returned By The Grand Jury To A Judge In Open Court".

(19) The court erred in making a remark in the jury's presence to effect that appellant was a liar.

(20) The court erred in denying motion for determination of mental competency.

2. Federal Rules of Criminal Procedure 52, embodying statutes and decisions of long standing, admonishes us that "any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded." [18 U.S.C.A.]

pellant the Chevrolet; Mrs. Darnell and a Mr. Thompson, employees of the Vulcan Motel, who identified appellant and Reed as being present there; Mrs. William A. Reed, who testified that during the month of September, 1950, she had received a telephone call from her husband in Birmingham and at that time had spoken to appellant, and that the appellant subsequently called her home in Washington inquiring as to Reed's whereabouts; Mrs. Ruth May, who was employed at the Vulcan Motel in September, 1950, and who identified a registration card from said motel which had been signed by the persons who had registered there; Mr. O'Brien, the Clerk of the Court for the Eastern District of Louisiana, who identified certain papers forming part of the record in the case which bore the signature of appellant; and Mr. Fred Miller, handwriting expert of the Federal Bureau of Investigation, who testified that the handwriting appearing on the Vulcan Motel registration card was written by the same persons who had written the papers identified by O'Brien.

The appellant extensively cross examined all of these witnesses, particularly Reed, with whom his examination showed he was, and had for some time been, quite well acquainted. In addition, while he did not take the stand or otherwise testify in the cause, he produced two witnesses, his brother and another by whom he sought to prove an alibi in effect that he had not been in Birmingham, Alabama, but had flown from some place in Kentucky to New Orleans, on September 28th or 29th, that he, his brother, and Reed had known each other for some time, that he and Reed had visited his brother in Kentucky, and that his brother had come to New Orleans for the purpose of buying the 1950 Ford car which Reed was driving when he was arrested.

■ Arranging and replying to appellant's points in an order inverse to their merit, we take up first, as particularly lacking in debatable merit, appellant's point No. 2, that he was denied a speedy trial, to dispose of it by saying that, whatever might be said of his demand and complaint as a basis for release on *habeas corpus*, or for a dismissal of the indictment for failure to proceed with the trial, now that the case has been proceeded with to judgment, this point has become moot. It presents nothing relevant to the sole inquiry here, whether prejudicial error was committed on the trial of the cause requiring a reversal of the judgment of conviction.

■ His point No. 5, that he was prejudiced by newspaper publicity and the parading of many witnesses in the course of the trial, is equally unmeritorious. Appellant's brief does not point out, nor does a search of the record reveal, any basis for the claim asserted. On the contrary, the record convincingly shows as to newspaper publicity that every necessary and proper precaution was taken against prejudice to the defendant therefrom, including inquiry of, and instructions to, the jury. It shows, too, that the claim that the witnesses were paraded for effect before the jury, is wholly without foundation.

Equally frivolous and groundless are points 4, 6, 8, 11, 13, 14, 15, 18 and 19, each claiming procedural error. In respect of each, the record fails to show that there was any departure from proper and established practices which would constitute prejudicial error. Indeed, it shows affirmatively that the procedures followed were in all respects proper, in accordance with due process and the requirements of trial procedure.

■ Specifically as to point No. 4, the record shows that the remarks of court and counsel, of which appellant complains, were the unavoidable result of the way and manner in which, acting as his own counsel, he chose to conduct his case.

While in the main, with an astonishing aptitude for conducting a criminal case well, defendant kept within the role of counsel for himself which he had assigned himself, he did occasionally, as any lawyer is apt to do, lapse from the role of counsel into that of witness. It was, therefore, entirely proper for the Government's counsel to object, and the court on such occasions to admonish the defendant acting as his own counsel that he must not do so.

As to point No. 8, and subdivision (a) thereof, the record shows that there was

no prejudicial error committed in connection either with the refusal to admit the proffer of two dogs or the photographs of dogs, both because the proffer of the dogs was not material and because, as to the photographs, they were offered in evidence and exhibited to the jury. It shows, too, as to subdivisions (b) and (c), that there was no error. The proposed re-direct examination of Frank Shelton as to why the F. B. I. had visited him could throw no light on, it was irrelevant to, the inquiry with which the case was concerned, and it was entirely within the sound discretion of the court whether the exhibits should be taken to the jury room. Indeed, in view of appellant's claim that he might well be prejudiced by some of the things said in the pleadings used in comparison of handwriting, the appellant would no doubt have complained more vigorously if the exhibits had been sent to the jury.

As to point No. 11, complaining as error of the inquiry made of Frank Shelton and Paul Davis, whether they had testified at other times for appellant, no prejudicial error was shown, for Davis answered the question in the negative, and neither the question to, nor the answer of, Frank Shelton referred to a criminal proceeding.

Point No. 13, attacking the indictment because it charged that the defendant transported or caused to be transported, is completely without merit. Defendant was guilty as a principal, if he either transported the car or caused it to be transported, and the words "caused to be" were, therefore, surplusage.

It is equally true that point No. 14 is wholly insubstantial. The court in his general charge fully and fairly instructed the jury on the law of the case, giving, in the course of it, several charges requested by the defendant. The only charges defendant asked which were refused were those which were already fully and correctly embodied in the main charge.

As to point No. 15, the claim that, by the complained of actions of the court in speaking to counsel for the government, to the marshal, and to the handwriting expert about the case outside of his presence, appellant was denied the right to be present as his own attorney at every stage of the proceeding, is more than frivolous, it is fantastic. There is no showing, or even claim made, that anything was done or said on the occasions complained of that was, or could be, prejudicial or harmful to appellant.

Equally fantastic on the record is the contention made under point No. 18.

As to point No. 19, the record does not support defendant's claim that the court called defendant a liar. As appears from appellant's brief at page 100 and in the record at page 1369, while the appellant was presenting and arguing to the court motions and exceptions, the court, without particularly identifying the mis-statement, after stating for the record that the defendant had made a mis-statement and the defendant had stated, "If I made a misstatement, I would like the jury to know what it is", said, "The record will show", whereupon the defendant took an exception, stating, "The court said that I made a mistake, and I would like to know what it is.", to which the court replied, "The record will show it. Proceed with your next motion." Certainly nothing in this colloquy presents any real claim of reversible error.

There remain for grouping and discussion nine points which are in their nature not frivolous and technical but serious and substantial and upon a different record might present matters of grave concern.

These points are: points 1, 9 and 10, which, because they deal with the arrest of defendant and the matters connected therewith and arising thereout, are grouped for treatment; point 3, dealing with defendant's claim that he should have been allowed to conduct his case and also to have counsel to assist him; points 7 and 16, dealing with the summoning of witnesses for the defendant at his request but at government expense; point 12, claiming errors in connection with the admission of handwriting evidence; point 17, the denial of appellant's motion to inspect Reed's written statement of May 1, 1952, and point 20, the denial of defendant's request for a psychiatric examination to determine his mental capacity.

812

No reversible error in connection with either points 1, 9, or 10, is made to appear. As to point 1, while we agree that appellant had standing to complain of his arrest and the seizure of the car in question, the record furnishes no basis for his complaint. This is so, both because the record does not support the claim that the seizure was made by state officers acting for, or in concert with, federal officers, within the meaning of the federal exclusionary rule, and because, if it did, there was probable cause in the circumstances detailed for the arrest and seizure.

As to point 9, there was no effort to convict defendant of the sale of the 1950 Ford. Reed, charged in a separate indictment, had pleaded guilty with respect to that car and was serving a sentence therefor, and the jury had this from his own lips. The fact that defendant was arrested while following in the Chevrolet the Ford car that Reed was driving is admissible as part of the *res gestae* of the arrest and the arrest and the detention, and has bearing on the disputed issues in the case. The same is true as to point 10.

Appellant's point 3, that he was denied the assistance of counsel, in that he was denied the right "to manage his own case and yet have the assistance of counsel", while in our opinion, on this record, without merit, is one of those which deserves and requires fuller discussion.

This is the record. Before the cause came on for trial, among many motions filed by defendant there were: one for leave to proceed in *forma pauperis*; a motion to be furnished with adequate facilities for effectively conducting his defense, including reasonable access to legal material; and motions for inspection of grand jury minutes, to dismiss the indictment, for bill of particulars and for discovery and inspection of evidence under Rules 16 and 17(c), Federal Rules of Criminal Procedure, 18 U.S.C.A.; and a motion to suppress evidence.

On April 16th, the day these motions were filed, one Gill, who had been defendant's attorney, informed the court that he had withdrawn as counsel, and the defendant, being then interrogated by the Assistant United States Attorney as to whether or not he desired counsel to be appointed by the court, declared that he did not, and, at the suggestion of the district attorney, he signed and filed the following waiver of the assistance of counsel:

"I, J. Paul Shelton, defendant in the above numbered and entitled proceeding, having been advised of my constitutional right to have assistance of counsel for my defense, hereby declare that I do not desire the assistance of counsel and hereby waive my right to have the assistance of counsel for my defense.

"Jay Paul Shelton."

There followed, extending over many pages of record, requests and motions by defendant and a statement filed April 24th, in which the defendant alleged:

"The waiver of counsel applied only to the right to be represented by counsel in open court. The defendant, although he has elected to plead and manage his own cause personally, specifically reserves the right to the assistance of counsel outside the court room."

At a later time, after a great many discussions and hearings had been had before the court on preliminary motions and matters of interest to the defendant, occupying more than 360 typewritten pages, the defendant suggested to the court in regard to the conduct of the trial:

"I will be representing myself and it is going to be a rather unusual circumstance. Of course, probably the court has not been confronted with it before, but I would like to know if it is possibe to appoint amicus curiae to assist a defendant representing himself. It would be of great assistance in preparing suggested charges to the jury, etc."

Judge Christenberry:

"Now you are either going to be represented by counsel or you are not. Is that understood? I know very well what you are proposing to do. As far as your presenting problems which are

novel, I think we can get along better if you will not go on that assumption. There is nothing unusual about your case as far as I know. It is just another criminal case and you are the defendant in it."

The defendant:

"Yes, Sir, you have said that many times."

The Court:

"Let's understand this to start off with. You are either going to be represented by counsel or you are going to represent yourself."

The defendant:

"Your Honor, what I was asking was not to have a lawyer say a word in the court room, merely to have him advise me during the trial."

The Court:

"Well, the court is not going to appoint a lawyer and have him occupy an inferior position in the defense of your case. A defendant is entitled to have counsel of his own choice if he can afford to employ one. Otherwise the court will appoint a lawyer to represent him."

The defendant thereupon took an exception to the ruling and from then on, and on numerous occasions, he insisted for various reasons put forward by him that he was entitled to the assistance of counsel, meaning that he was entitled to conduct his own case but to have counsel advise him and also conduct his examination while on the stand as a witness and make the proper objections if the defendant desired to take the stand. This position he never departed from, but, instead, in season and out of season, on the occasion of his multitudinous motions made before, during, and after the trial, defendant persisted in his contention that, under the Constitution of the United States, he had the right to assistance of counsel, as he interpreted those words, and

that the statute, section 1654, Title 28 U.S. C.A.,[3] which undertook to state the defendant's right in the alternative was contrary to the Constitution and invalid.

█ We cannot agree with the defendant that the statute was invalid or that the action of the court in declining to permit the defendant to dictate the way in which his case should be tried, deprived him of any constitutional right. Indeed, his stubborn and persistent contentiousness in respect to the reasonable rulings and requests of the trial judge in the matter of the conduct of the trial and the judge's patience and uniform courtesy in conducting it under great difficulties both tremendously and unduly prolonged the trial and afforded him the widest latitude to get before the jury matters he wished them to know without his having to take the stand.

Points 7 and 16, of which the defendant seeks to make a great deal, do not, when the claims are compared to the facts of record, present any substantial ground for complaint.

The first, in respect of the claims detailed in point 7, that the court erred in denying subpoenas for particular named witnesses, in threatening defense witnesses, before they testified, with grand jury investigation for perjury, and in denying appellant's motion to interview government witnesses before they were excused, is rebutted by a record showing the most detailed and painstaking consideration of all of the defendant's requests made in advance of the trial and out of the presence of the jury, and the exercise of a sound and informed discretion in granting and denying them. The record shows, too, that the court's caution to the defendant who had stated what the desired witnesses would testify to, in effect that testifying was a serious matter and the witnesses should be cautioned accordingly, was made out of the presence of the jury and of the witnesses, and could not have acted as a threat to the witnesses un-

**3.** "1654. Appearance personally or by counsel

"In all courts of the United States the parties may plead and conduct their own cases personally or by counsel, as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."

Cf U. S. v. Mitchell, 2 Cir., 137 F.2d 1006; U. S. v. Foster, D.C., 9 F.R.D. 367.

less the defendant conveyed it to them. Subdivision (f) of point 7 is not supported by the record, but if it were, this would not constitute reversible error, for the defendant made no showing that his desire to examine the witnesses summoned by the government was any more than a fishing expedition, none that any of them would have testified favorably to his cause.

As to the claim of point 16, that the court was at fault in not ruling on his motion to subpoena witnesses until conclusion of the government's case in chief, the record shows without dispute that on June 25th, appellant had not filed his list of witnesses, and, further, that defendant stated to the court that it would not be necessary to subpoena his witnesses to show up on Monday morning, the day of the trial. On July 15th, he first filed his motion under rule 17(b), five days before the trial date. It is perfectly clear from the whole record that no reversible error was committed in connection with this claim.

■ As to point 12, that there was error in admitting handwriting evidence, an examination of the record makes it plain that none of the subdivisions (a), (b), (c), or (d), is well taken, indeed, that there was no error, reversible or otherwise, committed in connection with the matters point 12 deals with. There was abundant predicate laid in the evidence, as to its signing by defendant, for the admission into evidence of the Vulcan Motel registration card. The handwritten motions used as standards of comparison, identified by the clerk of the court, as papers filed in the instant case, were under settled rules of law,[4] properly used as standards of comparison. Neither is there anything of substance in appellant's claim that the use for comparison of pleadings and papers which he had voluntarily filed in the court constituted compulsory self incrimination. Finally, the record does not at all support defendant's claim that the handwriting evidence was admitted in violation of a binding stipulation and that the ruling admitting it took appellant by surprise and prevented his properly meeting the proof. Indeed, the record shows that, while the government's expert was on the stand on cross examination, defendant was given his choice of recessing the case to another day to give him an opportunity to consult with an expert of his own selection or of continuing his examination of the government's expert, and concluding the case therewith, and that, after consideration, he deliberately chose the latter course.

■ Appellant does, indeed, make a great claim of error under his point 17, in the action of the court in denying him permission to inspect Reed's written statement of May 1, 1952, given to the Federal Bureau of Investigation, citing in support of his position Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369.

Unfortunately for the appellant, he does not claim, and, if he did claim, the record makes no showing in support of the claim, that Reed's statement of May 1, 1952, conflicted with the statement made upon the stand. On the contrary, the record shows that the defendant claimed only that the statement which was in substance the same that Reed was making on the stand was in contradiction of earlier oral statements made by him or his earlier action in not incriminating the defendant.

The district judge, examining the statement, concluded that there was no inconsistency between it and the statements Reed was making on the stand, indeed there could not be as it was upon the basis of this statement that Reed was brought from the penitentiary and placed upon the stand.

If, therefore, the court erred in not permitting the defendant to see the statement as a basis for his cross-examination, the error could not have been reversible error because the defense neither claimed nor showed what the Supreme Court held in the Gordon case was necessary, that the documents, possession of which was demanded, "were contradictory of his present testimony and that the contradiction was as to relevant, important and material matters which directly bore on the main issue being tried,

---

4. Withaup v. U. S., 8 Cir., 127 F. 530; Hartzell v. U. S., 8 Cir., 72 F.2d 569; Dean v. U. S., 5 Cir., 246 F. 568; Reining v. U. S., 5 Cir., 167 F.2d 362.

the participation of the accused in the crime."

Under these circumstances and on this record, it would be straining at a gnat to say that, if technically the court should have permitted the defendant to inspect the documents, any substantial injury to him has occurred therefrom which requires reversal of the judgment.

■ Appellant's final point, No. 20, that there was reversible error in refusing to appoint a psychiatrist to determine appellant's mental competency, while good enough if the facts supported it, is not supported by any substantial facts here. The statute, section 4244, Title 18, U.S.C.A., provides for such an examination where the district attorney, the court, or the defendant "has reasonable cause to believe that a person charged with an offense * * * may be presently insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense".

Here the matter came up not formally, but in the course of a running colloquy between Judge Christenberry and the defendant in which the judge apparently out of humor with something defendant was doing or saying in the conduct of the case, said, "Mr. Shelton, let me ask you something. Have you ever had a psychiatric examination?" Mr. Shelton: "Your Honor, I think perhaps I ought to have one." The Court: "I think perhaps you should." I am asking you this question. "Have you ever been in an Institution?" Mr. Shelton: "No, no your Honor." Whereupon the defendant moved that the court appoint three psychiatrists to examine him, and the court denied the motion. Then the defendant, stating, "If your Honor denies that motion, I would like to make another motion that the reference to my being mentally unbalanced be stricken from the record." The Court: "Strike it from the record."

Much later in the course of the numerous and continued hearings on motions, defendant repeated his request for the appointment of a psychiatrist, and the court said, "No, a lot of water has passed under the bridge since the court made that observa-tion originally. There is no basis here for the appointment of a psychiatrist. I think you are intelligent, smart."

At no time did the defendant interpose the defense of insanity, or, except as above stated, indicate in any way that he felt that he was incapable of conducting his case. On the contrary, he insisted that he, and only he, could and should conduct it, and by his conduct of it he showed that he was completely at himself and in no sense, in the language of the statute, "insane or otherwise so mentally incompetent as to be unable to understand the proceedings against him or properly to assist in his own defense". Point 20 presents no reversible error.

No reversible error appearing, the judgment is

Affirmed.