**George H. MOOREFIELD, Petitioner,**

v.

**Samuel P. GARRISON, Warden, and the State of North Carolina, Respondents.**

No. A–C–77–73.

United States District Court,
W. D. North Carolina,
Charlotte Division.

Feb. 12, 1979.

McLean, Leake, Talman & Stevenson, Asheville, N. C., for petitioner.

Richard N. League, Asst. Atty. Gen., Dept. of Justice, Raleigh, N. C., for respondents.

## MEMORANDUM OF DECISION

McMILLAN, District Judge.

George Henry Moorefield, the petitioner, operated a store in Maggie Valley, North Carolina, at which he peddled books and other materials commonly termed "pornographic." He operated out of premises leased from another. On August 1, 1975, some time around 8:45 or 9:00 P.M., the building was observed burning. Moorefield had been in the building a short time (about dinner time or "about 5:00" or "a few minutes") before the fire. He was prosecuted for unlawful burning of the building in violation of Chapter 14, § 62 of the General Statutes of North Carolina. He was tried January 27–30, 1976, in the Superior Court of Haywood County, North Carolina, and was convicted by the jury. On January 30, 1976, he was sentenced to a term of twenty to twenty-five years in prison.

The conviction and sentence were affirmed by the North Carolina Court of Appeals, 33 N.C.App. 37, 234 S.E.2d 25 (1977), and on June 2, 1977, the Supreme Court of North Carolina denied certiorari. 292 N.C. 733, 236 S.E.2d 702. By those appeals, Moorefield has exhausted state remedies.

On July 5, 1977, counsel for petitioner filed this petition for writ of habeas corpus in the Asheville Division of this court. The case was assigned to the late Judge Wilson Warlick, who died in 1978 before issuing a ruling. It was thereafter assigned to me. After a review of the two cubic feet or so of paper in the file an order was entered on August 14, 1978, dealing with numerous issues. A hearing was felt necessary by court and counsel on the remaining issues (see letter of September 7, 1978, from counsel for petitioner).

The hearing was conducted on October 16, 1978, and testimony was taken from the petitioner and from Mr. John Jay, the attorney who was appointed to assist him at his criminal trial.

Although the trial under the circumstances as summarized below was an unorthodox event, it looked at first as though no relief was possible under existing decisions and dicta; the petitioner had insisted on handling his own case; the trial judge had simply followed apparently controlling statements by numerous courts that a defendant may represent himself *or* be represented by an attorney, but may *not* be represented simultaneously by both; and petitioner had badly bollixed up his own defense.

Closer study indicates that this case on its facts is one of first impression, not controlled by prior decision or dictum, and that petitioner is entitled to a new trial because he was denied his Sixth Amendment right to the "effective assistance of counsel."

Three claims remained undecided after this court's order of August 14, 1978. The first claim (that Moorefield was denied due process because the bill of particulars alleged that the crime was committed at an hour somewhat different than the hour shown in the evidence) is without substance and is hereby denied without further discussion. The second claim, that the trial judge denied petitioner a fair trial by making sarcastic and demeaning remarks to or about him in the presence of the jury, lacks sufficient support in the record to constitute an independent basis for relief. One of the perils to a litigant representing himself is that he will at times incur censure or reprimand or prompting in his role as a *lawyer* which may unavoidably enure to his detriment in his role as a *defendant*. However, the very fact that such judge-to-counsel talk was frequently needed—and administered—is a part of the totality of circumstances leading to the conclusion that petitioner did not have the effective assistance of counsel. That claim will be merged into the third claim for purpose of decision.

The third claim is that petitioner was denied his Sixth Amendment right to the effective assistance of counsel. Petitioner says that although he insisted upon, and got, the right to control his own defense, he was prejudiced by the requirement that his lawyer remain completely silent during the trial. He says that he was entitled to have the lawyer address the court at least on purely legal matters, and that in any event the jury should have been instructed in some meaningful way about the court's restrictions on the courtroom behavior of appointed counsel. He says that the jury should have been told that the lawyer was being silent because the judge had ordered it, and that the lawyer's silence was not an indication of lack of confidence in petitioner's case nor of unwillingness of the lawyer to present a vigorous defense.

Some attention to what was said in and with regard to the appointment of counsel is necessary.

Moorefield was unable to retain a lawyer. At a hearing on November 11, 1975, Superior Court Judge Lacy H. Thornburg told Moorefield, "If you don't have a lawyer by Thursday morning, come back and tell me that you want a lawyer, and I will appoint one." [Transcript of hearing, p. 8.]

Moorefield returned to court on Thursday, November 13, 1975. The following appears in the record of that hearing:

"THE COURT: Mr. Moorefield, in your case, as we discussed, earlier, this week, you were going to attempt to get an attorney. Have you been successful?

"MR. MOOREFIELD: I have not. I have tried to get in touch with two attorneys to represent me, and I have not, as yet. I am going to defend myself.

"THE COURT: Are you saying that you are going to defend yourself?

"MR. MOOREFIELD: Judge, you said you were going to assign one to assist me in my defense. I'll accept it. I'll be, I'll gladly pay a reasonable fee, but not like some of them want to rob me.

"THE COURT: *What I'll do, at this time, is appoint you a lawyer to assist you in your defense.* Of course, he is bound

by the Professional Code of Ethics, as well as by the law.

"MR. MOOREFIELD: I can do the talking? Right?

"THE COURT: You can do the talking. You've got a good education.

\* \* \* \* \* \*

"THE COURT: So, you feel quite competent to represent yourself?

"MR. MOOREFIELD: Yes, sir. The only thing I would be short on would be the formalities. I've got a motion to put before the court, which I was able to get a copy to start it out, but I don't know, exactly, the legal formality to bring it into court.

\* \* \* \* \* \*

"THE COURT: Let me ask you this: I want you to fully understand, if you undertake to represent yourself, that under the laws of this State and Nation you will not receive any favored treatment by reason of doing so. You will have to abide by all the same rules of evidence and the same rules of conduct that will govern were you represented by counsel, and that neither the Judge nor the Prosecutor will favor you in any respect in an effort to aid or assist you in protecting your rights, whether you understand them or not, if you undertake to represent yourself.

\* \* \* \* \* \*

"THE COURT: First, let me ask if you want me to appoint an attorney to assist you?

"MR. MOOREFIELD: Assist me in the legal end, right?

"THE COURT: Right.

"MR. MOOREFIELD: And the fee will be reasonable?

"THE COURT: The fee will be set by the Court; what the Court determines to be a reasonable fee.

"MR. MOOREFIELD: And it's understood that I will set up my own defense?

"THE COURT: Well, you will be able to, right, *but he will be able to advise and assist you in any legal matters.*

"MR. MOOREFIELD: Okay. I'll take one.

[Short recess taken.]

"THE COURT: Mr. Moorefield, in your case I have requested Mr. John Jay to assist you, with the understanding that he will keep a time record of his services, and, ultimately, the Court will award him a fee for various considerations that I will take into account when he assigns a figure. Now, he has some six years experience before the State and Federal courts; he has had Military experience; he is highly regarded, and is licensed, of course, and is fully competent to assist you in the matter. I explained to him the limited basis on which he will be operating. I want you to take the time to meet with him, at least, briefly, and make a decision as to your Bill of Particulars or any other matter. You may go into any of the rooms around here, and you may close the door, and then let me know what you propose to do about the case."

[Transcript of hearing, pages 1 through 6. Emphasis supplied.]

Four days later, on November 17, 1975, Moorefield and his lawyer, Mr. Jay, appeared to present several motions to the same judge who appointed counsel. The following appears in the record of that hearing:

"THE COURT: All right. Who desires, then, to be heard, you, or Mr. Moorefield, Mr. Jay?

"MR. JAY: Mr. Moorefield will be heard. If Your Honor please, prior to his being heard, however, he does have some evidence that he'll want to put in.

"THE COURT: Well, my understanding, and I want you to make this clear to Mr. Moorefield: my understanding of the statutory law of this state, as well as the case law controlling it, is that he has a right to appear himself, or he has a right for you to appear in his behalf, as attorney, but he does not have the right to appear both ways, so I want either him or you to address the Court.

"MR. JAY: I was going to ask, merely, if the District Attorney would stipulate to this evidence.

"THE COURT: Well, let Mr. Moorefield, if he's going to handle it, handle it.

"MR. JAY: Give it to Mr. Buchanan—

"MR. MOOREFIELD: I would like to rule on the motion of yourself being disqualified, first, before the change of venue, if possible.

"THE COURT: You may proceed." [Transcript of hearing, pp. 4–5.]

In the course of ruling on these motions at the end of the hearing, Judge Thornburg stated:

". . . that on November 13th, the defendant indicated to the Court that he had been unable to hire counsel, and *agreed that it might, perhaps, be better that counsel be assigned at his expense to assist him in the preparation and trial of the case* with the understanding that he assumed the full *primary* responsibility for his defense of the case; that with that understanding, the Court then talked with Mr. John I. Jay, attorney of six years experience, licensed attorney, well-qualified, and familiar with practice in State and Federal courts, *to assist Mr. Moorefield in the handling of his case if he chose to consult with him* ; . . . ." [Transcript of hearing, page 38. Emphasis supplied.]

The colloquy among the appointing judge and Moorefield and Jay can *perhaps* be interpreted to mean that the condition of the appointment was that the lawyer speak *neither to judge* nor to jury. It is also, however, subject to the interpretation that this judge *in that particular motion hearing* wanted to hear only from one or the other, but not both. It is much more susceptible of the interpretation that the lawyer was appointed "to advise and *assist* . . . *in any legal matters*"; "*to assist him in the preparation and trial of the case*" and "*to assist* . . . *in the handling of his case*." The understanding that Moorefield assumed the full *"primary"* responsibility, though it implies that the attorney's role would be secondary, nevertheless falls far short of a ruling by the court that the lawyer could not even address the court on legal matters in the absence of the jury.

A genuine question exists on this record whether there ever was in fact a knowing and intelligent waiver of all meaningful speech and advocacy by petitioner's lawyer. It was a reasonable conclusion, from what had happened, that the lawyer would be able to give meaningful *assistance* as well as advice, and that at the very minimum he would be able to discuss evidentiary and legal questions with the court *and* to make arguments on such matters. John Jay, petitioner's attorney, so testified at the evidentiary hearing before me. Petitioner and his counsel could have entertained on this record a rational expectation that the assistance of counsel would be meaningful and "effective" as contemplated by the Sixth Amendment.

Any illusion to that effect was thoroughly dispelled by what happened at the trial, which was conducted two months later on January 27–30, 1976, before a different judge. The record shows that whenever Jay, the attorney, started to speak to the judge, he was silenced by the judge, and was required to address any remarks to petitioner, and, so far as the record shows, was not allowed to utter any significant words to the court or the jury.

The first such exchange appears on page 24 of the record where, even in the absence of the jury, the court addressed a legal question not to counsel direct but to counsel through petitioner, as follows:

"THE COURT: Does the attorney, who has been assisting you, has he afforded you precedents to cite to the Court?

"THE DEFENDANT: No, sir.

"THE COURT: Has he searched for any? To your knowledge?

"THE DEFENDANT: Not to my knowledge.

"THE COURT: Well, ask him whether he has or not.

"MR. JAY: No, sir, I haven't."

The first time Attorney Jay undertook to volunteer any information on the part of his client, again in the absence of the jury, is recorded on page 28 of the record. Defendant was seeking to introduce an exhibit, and the following occurred:

"THE COURT: Does that, likewise, apply to Defendant's Exhibit AA?

"THE DEFENDANT: No, that's here, Your Honor.

"MR. JAY: If Your Honor please, if I may—

"THE COURT: I'm sorry, sir, I will not be able to hear you; you might desire to state something to Mr. Moorefield."

Only one other time during the course of the trial, so far as the record shows, was counsel ever allowed to volunteer a word to the presiding judge at all, either in the jury's presence *or at bench conferences or chambers conferences out of the presence of the jury*! That remark—of no particular consequence—is the one quoted below from page 139.

"MR. MOOREFIELD: Objection. He has markings on there that hasn't been explained.

"THE COURT: Let me see it.

"MR. JAY: *I believe Mr. Buchanan is about to satisfy the objection, if Your Honor please.*

"MR. MOOREFIELD: Withdraw the objection." ·

[R.p. 139, emphasis supplied.]

The other occasions when Jay was mentioned were as follows:

"THE COURT: Let me ask you one question, at least one question, and that is: If the arrest warrant was legal on its face, issued with probable cause, assuming that to be so, wherein then do you contend you would have been illegally arrested?

"THE DEFENDANT: That, I can't assume that the arrest was—

"THE COURT: *Well, sit down then and let your lawyer tell you the answer.*"

[R.p. 30; emphasis supplied.]

\*   \*   \*   \*   \*   \*

"THE DEFENDANT: I had nothing to do about that. That is that case, and this is my case.

"THE COURT: *You have a lawyer there. Sit down and talk to him about it.*"

[R.p. 41; emphasis supplied.]

\*   \*   \*   \*   \*   \*

"THE COURT: I said, 'now known to exist'?

"THE DEFENDANT: Well, I have quoted a lot of laws that exist, and they have been ruled upon; the Rules of Civil Procedure and the Constitution of the United States.

"THE COURT: *All right sir. Well, you talk to Mr. Jay about it.*"

[R.p. 46; emphasis supplied.]

\*   \*   \*   \*   \*   \*

"MR. BUCHANAN: The State also desires to exhibit State's # 12 to the jury for the same limited purpose.

"MR. JAY: *If Your Honor pleases —*

"THE COURT: Just a minute. What say you to 12?"

[R.p. 158; emphasis supplied.]

\*   \*   \*   \*   \*   \*

"WHEREUPON, in the *absence of the jury,* the following proceedings were taken:

"THE COURT: What says the defendant?

"MR. MOOREFIELD: Making a motion, Your Honor—

"THE COURT: *You may stand up, Mr. Jay.*

"MR. JAY: *May I speak for him*?

"THE COURT: *To* him.

"MR. MOOREFIELD: I make a motion for judgment as of non-suit and to dismiss, on the grounds that the evidence shown, has just shown that a fire, a building burned, and no other evidence is shown how it happened.

"THE COURT: Anything further?

"MR. JAY: I think that states it in a capsule—

"THE COURT: Don't state it to me. Speak to him.

"MR. MOOREFIELD: That's a capsule statement of it, Your Honor."

[R.p. 258; emphasis supplied.]

\*   \*   \*   \*   \*   \*

"THE COURT: Do you know what the word, 'impeach', means?

"MR. MOOREFIELD: I wish you would give me a definition of it.

"THE COURT: *State it to him, Lawyer.*

"MR. MOOREFIELD: I refuse to answer; it takes away my right of defense.

"THE COURT: Let the record show that the defendant has failed to establish, in any wise, how the witness, Snow, if called upon to testify, would produce relevant or material testimony in defense of the crime charged against the defendant in this case."

[R.p. 279; emphasis supplied.]

\* \* \* \* \* \*

"MR. MOOREFIELD: I've told you about the conspiracy.

"THE COURT: What would this fellow, Almond Jones, say if he came here and testified?

"MR. MOOREFIELD: I refuse to answer; you'd take away my defense.

"THE COURT: Now, it is a fact, is it not, that yesterday morning, that is, in the morning, in open court, here in Haywood County Superior Court, *your lawyer showed you the case of Edward Garrett Hoskins against L. L. Wainwright* —

"MR. MOOREFIELD: I did not look at whatever he showed me.

"THE COURT: Just a minute. Which such case appears in Volume 440, of the Federal Reporter, 2nd Series, at Page 69 and there following: Did your lawyer discuss that case with you?

"MR. MOOREFIELD: He hasn't, I don't remember . . . I didn't discuss that case with him, because I didn't want to hear about it.

"THE COURT: Nevertheless, your lawyer—stand up, Mr. Jay. You were tendered this case to read, is that right, Mr. Jay, by the Court?

"MR. JAY: *If Your Honor please, I was tendered that case to read by the Court; I read it.*

"THE COURT: *Did you attempt to advise the defendant with the report of that case?*

"MR. JAY: *Yes, sir, I wrote a note as to the pertinent headnote of it. I believe it was Number 2 or Number 3 . . .*

"THE COURT: *Be seated, Mr. Jay.*

"Now, Almond Jones, you say you do not desire to relate to me in any way how his testimony would be relevant or material to the crime charged against you, is that right?

"MR. MOOREFIELD: That's right."

[R.pp. 301–302; emphasis supplied.]

\* \* \* \* \* \*

"MR. MOOREFIELD: For what time?

"THE COURT: *Speak to him about alibi, again, Lawyer Jay.*

"(Discussion outside the record between defendant and his counsel.)"

[R.p. 310; emphasis supplied.]

\* \* \* \* \* \*

"MR. HIPPS: If the Court please, we move to let the witness explain his answer.

"THE COURT: Well, I'm going to let his lawyer confer with *him about the question that he asked.*

"MR. MOOREFIELD: I forget . . ."

[R.p. 433; emphasis supplied.]

\* \* \* \* \* \*

"THE COURT: That subpoena was duly issued you, today, was it not?

"MR. JAY: *Yes, sir. If I may speak as to the subpoena?*

"THE COURT: *No, sir you may not.*"

[R.p. 540; emphasis supplied.]

\* \* \* \* \* \*

The lawyer was thus reduced to the role of a dumb puppet. He testified that his participation was confined, in substance, to writing notes, pulling coattails, and whispering instructions or advice to his headstrong client, in open court before the jury.

No explanation to the jury by the trial court of the reason for this strange spectacle appears in the record.

The degraded and ineffectual part that a gagged lawyer must play has been expressly recognized by Judge Christenberry of the

Eastern District of Louisiana in *Shelton v. United States* (appellate citation 205 F.2d 806, 5th Cir. 1953) in a pretrial discussion with the defendant. The exchange was as follows:

"The Court:

"Let's understand this to start off with. You are either going to be represented by counsel or you are going to represent yourself.

"The defendant:

"Your Honor, what I was asking was not to have a lawyer say a word in the court room, merely to have him advise me during the trial.

"The Court:

"Well, the court is not going to appoint a lawyer and have him occupy an inferior position in the defense of your case. A defendant is entitled to have counsel of his own choice if he can afford to employ one. Otherwise the court will appoint a lawyer to represent him."

205 F.2d at 813.

■ The *"effective"* assistance of counsel is what the Sixth Amendment guarantees. *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963); *Marzullo v. Maryland*, 561 F.2d 540 (4th Cir. 1977). A good case can be made that a courtroom lawyer who has been silenced by the judge is worse than no counsel at all. This is especially true where no explanation is made to the jury. Granted that a litigant can waive his Sixth Amendment rights, it seems nevertheless obvious from this record that the gagged lawyer who sat with him in the courtroom was psychologically less effective than no lawyer at all.

North Carolina General Statutes § 1–11 provides: "A party may appear either in person or by attorney in actions or proceedings in which he is interested." This statutory right has been held by the Supreme Court of North Carolina to be in the alternative; thus, a party may not actively participate in trial proceedings when he is represented by counsel. *State v. Phillips*, 261 N.C. 263, 134 S.E.2d 386 (1964).

A federal statute, 28 U.S.C. § 1654, says about the same thing. It reads as follows:

"In all courts of the United States the parties may plead and conduct their own cases personally or by counsel as, by the rules of such courts, respectively, are permitted to manage and conduct causes therein."

Section 1654 has been *held* by circuit courts to entitle a trial court to put a gag on the litigant himself. *United States v. Sacco*, 571 F.2d 791 (4th Cir. 1978), cert. denied, 435 U.S. 999, 98 S.Ct. 1656, 56 L.Ed.2d 90 (1978); *United States v. Lang*, 527 F.2d 1264 (4th Cir. 1975); *United States v. Hill*, 526 F.2d 1019 (10th Cir. 1975), cert. denied, 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976); *United States v. Shea*, 508 F.2d 82 (5th Cir. 1975), cert. denied, 423 U.S. 847, 96 S.Ct. 87, 46 L.Ed.2d 69 (1975). It has been *said* by those courts that the right to counsel is in the alternative; that it may be waived; and that a person has to elect whether he will be his own lawyer or have the case tried by a lawyer.

Moorefield's is, however, the only case I have been able to discover in which a court has *held* that a gag can be placed upon the *lawyer* rather than upon the lay *defendant* in a criminal trial.

The real question is not the interpretation which has been placed by courts upon *statutes* passed by Congress or state legislatures, but whether the procedure followed in this case is consonant with the Sixth Amendment to the United States Constitution, which reads:

"In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

■ Waiver of counsel should never be accepted, and limits on a lawyer's role should not be imposed, under terms and conditions which make of a criminal trial a comic or ridiculous or humiliating spectacle. A courtroom trial is a fast breaking event. Questions must be anticipated; objections must be made; favorable points must be presented to judge and jury, often upon the spur of the moment and with clarity and correctness born of long training and prac-

tice. Lawyers are better at this than laymen. There is a vast amount of publicity and concern now originating from high judicial offices of this land, deploring the allegedly sad quality of advocacy in courtrooms. Convictions are reversed—properly so—if a criminal defendant is denied the "effective" assistance of counsel. Against that background, it seems hollow to say that a gagged lawyer satisfies the constitutional right to counsel in a felony prosecution.

A felony prosecution is not a closed meeting of a board of directors or a business conference where highly trained people, often skilled themselves at forensic arts, can enjoy the effective assistance of counsel by conferring privately with them or writing notes. A courtroom trial is a type of drama—a contest; and a courtroom lawyer, whatever his manner or mannerisms, has to be in heart and reaction a pit fighter—an advocate—one whose antennae are tuned to every question and situation and whose tongue is ready upon instant notice to assert all legitimate rights and constitutional protections on behalf of his client.

It makes life more bearable in the courtroom if the judge has to hear only one voice. If I had been trying Moorefield, I would have *wanted* to do about what Judge Ferrell did. In fact, after reading the trial transcript, I am not at all certain that I could have endured Moorefield's persistent, abusive and contentious conduct with the sustained patience and forebearance shown by Judge Ferrell. The pleasure of judges, however, which is the principal interest protected by the statutes quoted above, has no standing against the United States Constitution. Judges have to do a lot of things they don't like. The ancient right to represent one's self had been recognized before the Sixth Amendment was passed; in fact it was once the only way a defendant *could* defend. Notwithstanding that right, it is the *right to counsel*, rather than the right to *represent one's self*, which is expressly guaranteed by the *Constitution*.

The trial itself was a shambles. It opened with petitioner refusing to comply with the court's orders to disclose what some allegedly needed witnesses would testify, so that the court could determine whether they should be subpoenaed. He charged that the proceedings was "entirely illegal and in violation of my civil and constitutional rights and done with malice by local and state officials and citizens of this state" (R.p. 9). He demanded subpoenas for approximately half a hundred state officials from Haywood and Buncombe Counties, including district and Superior Court judges and prosecuting attorneys. He asserted Fourth Amendment violations, although the Fourth Amendment did not seem to be legitimately involved in his defense. He charged, without evidence, a conspiracy of prosecutors, judges, aldermen, councilmen and others to kill him or to convict him of crime and run him out of the state (R.p. 47). He accused Judge Ferrell of running a "Kangaroo court" (R.p. 52). (This was done in the absence of the jury; the court promptly found him in contempt of court but that finding was not publicized and the punishment for it (ten days) was not imposed until after the verdict and sentence had been completed.) This was all simply a prelude to what was to come.

In later parts of the trial he enlarged the class of alleged conspirators to include federal people, persons now judges of the North Carolina Court of Appeals, and the North Carolina Attorney General. He required the court to go exhaustively through his list of fifty or so witnesses, requesting subpoenas for their testimony but refusing to indicate *in camera* to the court the nature of their testimony so that the court could determine its relevance to his defense. He presented no evidence of the conspiracy the existence of which he repeatedly proclaimed. When a witness testified without substantially harming his cause, he frequently asked questions which would make competent hearsay repetition by the witness of damaging evidence against him.

The principal evidence against petitioner was the testimony of two young boys, one eleven years old, who testified that they saw him drive up to the store with a male

companion and go in, and carry some boxes back and forth, and then drive away. This, according to those boys, was "a few minutes" before the fire broke out. Where a competent lawyer would have spent a short time asking only the necessary questions to establish a reasonable doubt as to the time interval between the visit and the fire and to establish doubt as to the accuracy of recollection of boys at play as to passage of time, Moorefield bludgeoned many witnesses, including the boys, with so many unnecessary questions that the genuine doubt as to the accuracy of their testimony was fairly well covered up by his unnecessary repetition of that testimony. Everybody was wrong but Moorefield. His latest of many communications to this court has accused the judge of personal responsibility for the cancer which has apparently been discovered while he has been in prison.

In the context of the gagged lawyer situation, the way Judge Ferrell conducted the trial, so far as can be told from the record, was even-handed and thorough and incredibly patient.

The question is whether any judge under the circumstances, with an obviously egocentric Moorefield representing himself, can ever provide a fair trial without letting the lawyer speak.

No one can say with assurance that, ungagged, Mr. Jay would have produced a different result. The rest of the world is not privy to what Mr. Jay and Mr. Moorefield may know. It is apparent from the opening battle between court and petitioner that, before the jury ever heard any testimony, Moorefield had demonstrated his own self-destructive determination. It appears from the record that he showed in the first half-day of debate with the judge outside the jury's presence that he needed all the "effective assistance of counsel" that the law could allow. He was deprived of that assistance originally by his own self-willed refusal to accept the full-fledged help of a lawyer. He was deprived of it before the testimony began by the ruling of the appointing judge, endorsed and perhaps enlarged by the trial judge, which was no doubt made in good faith, that his lawyer

could not talk. By the time the jury were brought into the picture it must have been apparent to the court, as it was to me during the habeas corpus hearing, that Moorefield was headstrong, cantankerous and disputatious, and would thoroughly exhaust the patience of court and jury during the trial. He does not curry nor encourage favor; he stirs up animosity; he is a poor advocate and his own worst enemy; he solicits arbitrary action—and he is the kind of litigant who most sorely tests the system.

■ *He is therefore the kind of litigant who most severely needs the most "effective assistance of counsel."* The very thing in him which makes him think he is a better lawyer than the professional is illustrative of a personality which makes him most in need of counsel. It was not too late, after that first morning's harangue, to un-gag Mr. Jay. It should have been done.

### CONCLUSION

Petitioner was prejudiced by denial of effective assistance of counsel. This violated his rights under the Sixth Amendment. His conviction should be set aside. The writ of habeas corpus should issue. Upon re-trial, if one occurs, the gag, if one is to be used, should be placed on Moorefield rather than on his lawyer. All other grounds for relief are denied.