472 A.2d 953

Eugene Sherman COLVIN

v.

**STATE of Maryland.**

**Nos. 84, 114, Sept. Term, 1981.**

Court of Appeals of Maryland.

March 16, 1984.

90

94

George E. Burns, Jr., Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender and Martha Weisheit, Asst. Public Defender, Baltimore, on the brief), for appellant.

Deborah K. Handel and Jillyn K. Schulze, Asst. Attys. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

COUCH, Judge.

Eugene Sherman Colvin, the appellant, was found guilty by a jury in the Circuit Court for Anne Arundel County, of first degree premeditated murder, felony murder, robbery with a deadly weapon, and daytime breaking and entering. Colvin selected a jury to conduct the sentencing proceeding pursuant to Maryland Code (1957, 1982 Repl.Vol.), Article 27, § 413; following this proceeding the jury imposed the death penalty. The matter is now before us for review, as provided for by Article 27, § 414.

The parties have agreed to a statement of facts from which the underlying events giving rise to this case may be gleaned. The victim, Lena Buchman, was an 82 year old resident of Florida. On September 9, 1980, at 11:00 A.M., she arrived in Baltimore to visit her family. That same afternoon Mrs. Buchman was alone in the home of her daughter, Marjorie Sorrell, when she was stabbed to death. A neighbor found her in the Sorrell home at approximately 2:30 P.M. Police and emergency units were dispatched to the home and Mrs. Buchman was flown to the Shock Trauma Unit of the University of Maryland Hospital, where she was pronounced dead at 4:23 P.M. An autopsy revealed a total of twenty-eight stab wounds on the body.

Entry into the Sorrell house apparently had been gained through a basement door. A glass pane in the door was found to have been broken and the chain locks were unhinged. A subsequent search of the premises revealed that all of Mrs. Sorrell's jewelry was missing, as well as a Timex wristwatch and a pocketwatch. As Mrs. Sorrell had recently had all her jewelry appraised and inventoried, she was able to provide police with detailed descriptions of her jewelry as well as photographs, in addition to serial numbers on the pocketwatch.

The investigation focused on the appellant when latent fingerprints, lifted from the pieces of glass from the basement door, were matched with known prints of Colvin. Moreover, the investigation disclosed that on September 17, 1980, Colvin pawned the Sorrell pocketwatch and a Timex wristwatch. The pocketwatch carried the same identification number as the watch taken from the Sorrell residence and the Timex wristwatch was identified by Mrs. Sorrell as the one taken from her house. The pawnbroker who negotiated the loan for the pocketwatch testified regarding the circumstances of that transaction. He stated the person pawning the watch showed him an age of majority card for identification. That card issued by the Department of Motor Vehicles was in the name of Eugene Sherman Colvin and the signature and picture on the card matched the person

pawning the watch. The pawnbroker noted the age of majority card number on the receipt. Additionally, a Department of Social Services card number, C–032679, was also noted on the receipt. At trial a Social Services employee testified that appellant had a case number and that any identification card issued to him would have carried the number 032679. Further facts necessary to a decision of the various issues raised by this appeal will be supplied in our discussion of those issues.

The issues which we must consider[1] generally fall into five categories: (1) pre-trial, (2) trial, (3) post-trial, (4) proportionality sentence review, and (5) constitutionality of Maryland's death penalty statute. We shall discuss these issues seriatim.

### (1)

The pre-trial matters in which Colvin claims error concern the denial of his motion to suppress certain evidence and its subsequent admission at trial. Additionally, he asserts that the trial court erred in failing to conduct a proper inquiry after he demonstrated an inclination to waive counsel.

### (a)

■ As to the first of these issues, we find no merit in appellant's contention that the age of majority card referred to above was erroneously admitted. The appellant testified that the card must have been found in an illegal search of

---

1. Art. 27, § 414(e):

"*Considerations by Court of Appeals.*—In addition to the consideration of any errors properly before the Court on appeal, the Court of Appeals shall consider the imposition of the death sentence. With regard to the sentence, the Court shall determine:

(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413(d);

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances are not outweighed by mitigating circumstances; and

(4) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

his home, whereas a police officer testified that it was discovered at police headquarters during a routine search of the appellant. As the testimony on the circumstances attending the seizure of the card was in direct conflict the trial judge was required to weigh appellant's credibility against that of the detective in determining the legality of the search. Maryland Rule 886 provides:

> "When an action has been tried by the lower court without a jury, this Court will review the case upon both the law and the evidence, but the judgment of the lower court will not be set aside on the evidence unless clearly erroneous and due regard will be given to the opportunity of the lower court to judge the credibility of the witnesses."

Appellant produced no evidence to substantiate his claim of an illegal search other than his testimony. Therefore, the rule is applicable to the trial judge's determination that the card was found during a search at the police station, incident to an arrest. We do not find the determination of the lower court in this instance to be clearly erroneous.

The trial judge, in ruling the card admissible, commented, *inter alia,* that it was routine to pat a suspect down for protection purposes at the police station. Because the officer had testified that he was specifically looking for the card at this time, the appellant argues the trial judge erred in admitting the card. This is so, he contends, because the trial judge either forgot this testimony or disregarded it. The Court finds this argument to be without merit. The Supreme Court has held that the fact of a valid arrest furnishes justification for a search for evidence incident thereto. In *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Court made clear that the Fourth Amendment permits the police to search fully the person of an arrestee, stating:

> "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification. It is the fact of the

lawful arrest which establishes the authority to search, and we hold that in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but it is also a 'reasonable' search under that Amendment." *Id.* at 235, 94 S.Ct. at 477, 38 L.Ed.2d at 440–41.

Subsequently, in *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), the Court made plain that *Robinson's* search for evidence incident to arrest rule extended to stationhouse searches when it stated:

"both the person and the property in his immediate possession may be searched at the station house after the arrest has occurred at another place and if evidence of crime is discovered, it may be seized and admitted in evidence." 415 U.S. at 803, 94 S.Ct. at 1237, 37 L.Ed.2d at 775–76.

Under *Robinson* and *Edwards* it is inconsequential that the search took place at the police station, or that the officer was looking for the age of majority card. It is the fact of a valid arrest which furnishes the justification for a search incident thereto in order "to preserve evidence on his person for later use at trial." *United States v. Robinson, supra,* 414 U.S. at 234, 94 S.Ct. at 476, 38 L.Ed.2d at 440.

Colvin then argues that when the factual basis of a ruling is articulated, those facts must appear in the record. We are not certain just where this argument is intended to lead us, but our review of the record persuades us that the trial judge gave several reasons for his ruling. These included a belief in the officer's testimony; the recording of the search at the police station in an official report by the officer before the question became an issue; the routine nature of a search of the person arrested; and the lack of Colvin's credibility because of his prior criminal record, and the fact that appellant had "the most to lose by having this card admitted." We cannot say the trial judge was clearly erroneous in his factual conclusions and thus find no error in the denial of Colvin's motion to suppress this evidence.

## (b)

The appellant next argues that the trial court erred in failing to conduct a proper inquiry after appellant demonstrated an inclination to waive counsel. What precipitated this issue may be quickly set forth. Prior to trial, the appellant had filed a motion by which he was seeking the dismissal of the public defender as his attorney and the appointment of an attorney of his own choice at the expense of the state. This motion was denied, but remade at trial. During the hearing on this remade motion the appellant also moved the court to allow him to defend himself *"to a degree."* Both motions were denied. The appellant now argues error in that the trial judge did not make an inquiry to determine whether there was an unequivocal waiver of counsel based on our holding in *Snead v. State,* 286 Md. 122, 406 A.2d 98 (1979). We believe appellant's reliance on *Snead* is misplaced. There, Snead asked for a continuance to allow his family to engage the services of a different attorney since he was dissatisfied with the assigned public defender. When the court refused to grant the continuance Snead stated, "I don't want no attorney then." *Id.* at 126, 406 A.2d at 100. We concluded that Snead's declaration that he did not want an attorney was sufficient to require an inquiry to ascertain whether he truly wanted to represent himself. *See* Maryland Rule 723(c).[2]

---

**2.** Maryland Rule 723(c) provides:

"When a defendant indicates a desire or inclination to waive counsel, the court may not accept the waiver until it determines, after appropriate questioning on the record in open court, that the defendant possesses the intelligence and capacity to appreciate the consequences of his decision, and fully comprehends:

1. The nature of the charges against him, any lesser included offenses, and the range of allowable penalties, including mandatory and minimum penalties, if any;

2. That counsel can render important assistance to him in determining whether there may be defenses to the charges or circumstances in mitigation thereof, and in preparing for and representing him at trial;

■ Our holding in *Snead* requires a two phase inquiry once the defendant makes a minimum "declaration" sufficient to constitute an assertion of the right to self representation. 286 Md. at 127, 406 A.2d at 101. If such circumstances exist then the court "should ascertain whether the defendant 'clearly and unequivocally' wants to defend himself." *Id.* at 128, 406 A.2d at 101. But, this first inquiry is only triggered if the defendant indicates a desire to defend pro se. In the case *sub judice,* no assertion was made to necessitate the threshold inquiry.

■ Unlike Snead, Colvin did not seek to engage a private attorney; rather he desired to select his own attorney, and have that attorney reimbursed for his services by the state. The Sixth Amendment to the United States Constitution provides that the accused in a criminal prosecution "shall enjoy the right . . . to have the Assistance of Counsel for his defense." The Due Process Clause of the Fourteenth Amendment guarantees the same right in state criminal prosecutions, including the right to the appointment of counsel in the case of the indigent defendant. *Argersinger v. Hamlin,* 407 U.S. 25, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972); *Gideon v. Wainwright,* 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963). However, an indigent defendant has no right to choose his appointed counsel. *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (1982); *State v. Renshaw,* 276 Md. 259, 347 A.2d 219 (1975); *see* Annot. 66 A.L.R.3d 996. The court in this instance made a proper inquiry into appellant's reason for the request, both at the motions hearing and at the subsequent hearing before the trial commenced. Having found no sufficient reason for the request, the motion was properly denied.

---

3. That even if the defendant intends to plead guilty, counsel may be of substantial assistance in developing and presenting information which could affect the sentence or other disposition;
4. That if the defendant is found to be financially unable to retain private counsel, the Public Defender or the court would, if the defendant wishes, provide counsel to represent him."

In the instant case, as recognized by the trial judge, the appellant was at best seeking "hybrid" representation, not making a statement from which the court could reasonably conclude that he desired self-representation. Thus, the predicate needed to trigger the threshold inquiry required by *Snead* or that required by Rule 723(c) was missing. This is underscored when the record as a whole is considered. Initially, when Colvin argued his motion for change of counsel, he stated to the court five times that he did not wish to "fire" his attorney. When Colvin made this motion for a second time he was again seeking to replace the public defender with an attorney of his choice at state expense. When this was denied he asked to be "allowed to defend [himself] to a degree." Admittedly, if he had asked to be allowed to defend himself and nothing more, the first phase of the *Snead* inquiry would have been triggered; but that was not the case. He modified those unequivocal words with the phrase "to a degree." We perceive no error here.

(2)

Appellant next asserts several claims of error occurring during the trial.

(a)

The first of Colvin's claims of error occurring during the trial concerns the jury selection process. The parties, by their briefs, agree that in an unreported chambers conference the appellant sought individualized voir dire examination of prospective jurors. The court denied the request pursuant to Maryland Rule 752.[3] Appellant claims prejudicial error in this ruling. He contends that in death penalty cases the attitudes of jurors toward the death penalty must be inquired into and, as some jurors could be reluctant to

---

**3.** Maryland Rule 752 provides:
"The Court may permit the parties to conduct an examination of prospective jurors or may itself conduct the examination. If the court conducts the examination, it shall permit the parties to supplement the examination by any further inquiry it deems proper or shall itself submit to the prospective jurors the additional questions proposed by the parties it deems proper."

answer truthfully to such inquiry, in the presence of other jurors, individual voir dire is necessary. However, no authority has been brought to the attention of this Court, nor have we found any, mandating individual voir dire under any circumstances. To the contrary, as appellant concedes, in the absence of a statute or court rule to the contrary, as long as the selection procedure results in a fair and impartial jury, the method and manner of conducting a voir dire rests within the sound discretion of the trial court. *Connor v. State,* 225 Md. 543, 171 A.2d 699, *cert. denied,* 368 U.S. 906, 82 S.Ct. 186, 7 L.Ed.2d 100 (1961); *see also Langley v. State,* 281 Md. 337, 378 A.2d 1338 (1977); *Piles v. State,* 233 Md. 487, 197 A.2d 238 (1964); *Grogg v. State,* 231 Md. 530, 191 A.2d 435 (1963). Moreover, when considering the position appellant urges this Court to adopt, we previously declined to find an abuse of discretion where the trial court denied a request for individualized voir dire in a capital case. *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983) (*Tichnell III*); *Poole v. State,* 295 Md. 167, 453 A.2d 1218 (1983); *accord United States v. Bryant,* 471 F.2d 1040 (D.C.Cir.1972), *cert. denied,* 409 U.S. 1112, 93 S.Ct. 923, 34 L.Ed.2d 693 (1973); *Irvin v. State,* 617 P.2d 588 (Okla.Crim.1980); *Turner v. Commonwealth,* 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied,* 451 U.S. 1011, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981).

In the instant case the record demonstrates the care with which the trial judge conducted the voir dire. Moreover, appellant's assertion that prospective jurors would not make the required admissions in the presence of others is contradicted by the record. There were prospective jurors who responded affirmatively to sensitive questions posed to the entire venire. The court then permitted individual voir dire by counsel of each of the jurors who responded affirmatively to the questions put to the group. This questioning was conducted at the bench out of the presence of the remaining jury panel.[4] It is mere speculation, unsupported

---

4. R.T. pages 9–10.

by the record, to conclude that there were others who harbored strong feelings about the death penalty who did not choose to acknowledge their feelings in front of other prospective jurors.

Under the circumstances presented by the instant case the decision of the trial court to conduct the voir dire *en masse* did not represent an abuse of discretion.

(b)

The second claim of error during the trial phase concerns appellant's challenge to the jury array on the ground of racial discrimination.

The Supreme Court has consistently ruled that "a conviction cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race." *Whitus v. Georgia,* 385 U.S. 545, 549–50, 87 S.Ct. 643, 646, 17 L.Ed.2d 599, 603 (1967) (citation omitted); *Strauder v. West Virginia,* 100 U.S. 303, 25 L.Ed. 664 (1880); *see also Rose v. Mitchell,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979) (additional cases cited therein apply this principle in circumstances involving grand jury discrimination).[5] However, "purposeful discrimination may not be assumed or merely asserted. It must be proven." *Swain v. Alabama,* 380 U.S. 202, 205, 85 S.Ct. 824, 827, 13 L.Ed.2d 759, 764 (1965); *Tarrance v. Florida,* 188 U.S. 519, 23 S.Ct. 402, 47 L.Ed. 572 (1903); *Lawrence v. State,* 295 Md. 557, 457 A.2d 1127 (1983); *Brooks v. State,* 3 Md.App. 485, 240 A.2d 114 (1968), *cert. denied,* 403 U.S. 907, 91 S.Ct. 2213, 29 L.Ed.2d 683 (1971). Moreover, the burden of proving the existence of purposeful discrimination is on the party asserting such discrimination. *Alexander v. Louisiana,* 405 U.S. 625, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). The appellant strives to accomplish this by stating that there was only one Negro in the array and

---

5. The principles which prohibit discrimination in the selection of grand juries also govern the selection of petit juries. *Pierre v. Louisiana,* 306 U.S. 354, 59 S.Ct. 536, 83 L.Ed. 757 (1939).

he was struck. He then relates this fact (unsupported by the record) to the general population ratio of blacks to whites in Anne Arundel County; he applies, in his brief only, the law of statistical probability and concludes that some invidious cause was at work to provide an array which contained only a single Negro. He also argues that, having shown this fact, he had made a prima facie showing of discrimination and it became the state's burden to overcome this presumption. While it is true that the state must rebut the presumption of discrimination once a prima facie case of invidious racial discrimination is established, *Alexander v. Louisiana, supra,* in this instance we find the state had no burden as appellant did not present sufficient evidence to establish a prima facie case.

What the appellant urges here is that upon showing only one Negro in the venire compared to the ratio of black to white in the general population of the County, he had made out a prima facie case of racial discrimination, casting the burden on the state to rebut the presumption of unconstitutional discrimination. Initially we note that a defendant has no right to a jury of any particular composition; the only right in this regard is to have the jury panel selected from a source which is reasonably representative of the community. *Alexander v. Louisiana, supra; Swain v. Alabama, supra; Cassell v. Texas,* 339 U.S. 282, 70 S.Ct. 629, 94 L.Ed. 839 (1950). Thus, the mere assertion that the venire contained only one Negro is not persuasive and is likewise insufficient prima facie evidence of purposeful racial discrimination.

Appellant attempts to bolster his argument by providing a statistical analysis, in his brief, to show that given the ratio of blacks to whites in Anne Arundel County the probability of producing a venire of eighty with only one Negro is 1 to 1700. From this he concludes the number of blacks on the jury was disproportionate to the racial distribution of the population of the County and therefore there was an invidious scheme to discriminate. Appellant has drawn conclu-

sions by comparing only *one* panel of eighty persons to a population group of 370,775 people. We find this unpersuasive and not in accord with established law.

The Supreme Court has held that not every disparity in proportions is constitutionally fatal. The mere fact of inequality in the number selected does not in itself show discrimination. *Akins v. Texas,* 325 U.S. 398, 403, 65 S.Ct. 1276, 1279, 89 L.Ed. 1692, 1696 (1945). Rather, what needs to be proven in order to establish a prima facie case of unlawful discrimination is that none or disproportionately few of the members of a particular class or race have been selected for jury duty over a significant period of time. *See, e.g., Castaneda v. Partida,* 430 U.S. 482, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977) (bare prima facie case of invidious discrimination with proof of long continued (11 years) disproportion in composition of grand jury); *Coleman v. Alabama,* 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed.2d 22 (1967) (prima facie case established by evidence that no Negro had ever served on grand jury, and few if any Negroes had served on petit jury panels, up to the time of the defendant's trial); *Arnold v. North Carolina,* 376 U.S. 773, 84 S.Ct. 1032, 12 L.Ed.2d 77 (1964) (prima facie case of systematic exclusion of Negroes established by testimony of court clerk that in 24 years only one Negro served on grand jury); *Eubanks v. Louisiana,* 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1958) (prima facie case established by evidence that in 18 years only one Negro chosen); *Reece v. Georgia,* 350 U.S. 85, 76 S.Ct. 167, 100 L.Ed. 77, *reh. denied,* 350 U.S. 943, 76 S.Ct. 297, 100 L.Ed. 822 (1955) (strong showing of systematic exclusions of Negroes made on uncontradicted evidence that no Negroes served for previous 18 years); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954) (discrimination shown by evidence that no Mexican or Latin-American served on grand jury or petit jury for 25 years); *Patton v. Mississippi,* 332 U.S. 463, 68 S.Ct. 184, 92 L.Ed. 76 (1947) (strong showing of systematic exclusion since no Negro had served on jury for 30 years); *Hill v. Texas,* 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942) (prima facie case made on evidence of

continuous omission of Negroes for 16 years or more); *Norris v. Alabama,* 294 U.S. 587, 55 S.Ct. 579, 79 L.Ed. 1074 (1935) (prima facie case established by testimony that no Negroes served on jury within the memory of witnesses who had lived there all their lives). Accordingly, we are not persuaded that the appellant made a prima facie case of systematic discrimination and thus we find no error.

■ Maryland Code (1973, 1980 Repl.Vol., 1983 Cum. Supp.), Courts & Judicial Proceedings, §§ 8–201—208, provides for random selection of jurors from voter registration lists.[6] Appellant contends the trial judge committed error by relying on this Court's ruling in *Wilkins v. State,* 270 Md. 62, 310 A.2d 39 (1973), *cert. denied,* 415 U.S. 992, 94 S.Ct. 1592, 39 L.Ed.2d 889 (1974), that the selection of jurors from voter registration lists was constitutional. The use of voter registration lists is designed to produce an array which is a representative cross-section of the community.[7] This official means of selecting prospective jurors is not unconstitutional even when it may have some racially disproportionate impact. *See Castaneda v. Partida, supra,* and *Swain v. Alabama, supra.* In order to establish a prima facie case of discrimination the party asserting such must show that the use of those lists resulted in purposeful discrimination.

■ In *Alexander v. Louisiana, supra,* the Supreme Court found a combination of factors constituted a prima facie case of racial discrimination. Among those factors was that the selection procedures themselves were not racially neutral. "The racial designation on both the questionnaire and

---

**6.** Section 8–104 of Cts. & Jud.Proc. specifies the source of prospective jurors.

"The jury commissioner or the clerk of the court shall select the names of prospective jurors from among those persons 18 years old or older whose names appear on the voter registration lists...."

**7.** Section 8–102(a) of Cts. & Jud.Proc. states as a declaration of policy:

"The jury shall be selected at random from a fair cross section of the citizens...."

the information card provided a clear and easy opportunity for racial discrimination." *Id.* 405 U.S. at 630, 92 S.Ct. at 1225, 31 L.Ed.2d at 542. *See also Whitus v. Georgia, supra* (jury list made under an illegal segregated system); *Castaneda v. Partida, supra* (selection system entirely discretionary and Spanish surnames are readily identified); *Avery v. Georgia,* 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953) (use of different colored tickets for whites and blacks gave opportunity to discriminate at various stages in the selection process). However, as these cases suggest, "an imperfect system is not equivalent to purposeful discrimination based on race." *Swain v. Alabama, supra,* 380 U.S. at 209, 85 S.Ct. at 830, 13 L.Ed.2d at 766. When attempting to prove a constitutional violation one must be able to establish that the procedures employed in the selection system resulted in continued unrepresentation of a cognizable group or class of qualified citizens. *Castaneda v. Partida, supra.* Appellant has neither established an abuse in implementation of the selection system nor systematic exclusion. Without more it cannot be said that Negroes have been excluded from the venire to such a degree to establish a prima facie case of racial discrimination. Accordingly, we find no error in the State's failure to rebut appellant's assertions.

### (c)

Appellant's next claim of error relates to his argument that the evidence was (i) insufficient to sustain his conviction for premeditated murder, and (ii) insufficient to sustain a finding of his criminal agency.

### (i)

The basis for appellant's first argument is that other than evidence of multiple stab wounds, there simply was no other evidence from which the jurors could have properly concluded the killing was a premeditated act. This is so, he contends, because although the number of wounds can be viewed as evidence of premeditation, it cannot, without more, constitute legally sufficient proof of premeditation. Assuming, arguendo, the validity of this proposition, we do

not believe appellant is helped thereby because there was other evidence from which the jury could find premeditation. Thus, we find the cases relied upon by appellant are distinguishable from this case.[8]

In Maryland the principles of law applicable to determining when a murder is deliberate and premeditated are well settled:

"[T]o be 'premeditated' the design to kill must have preceded the killing by an appreciable length of time, that is, time enough to be deliberate. It is unnecessary that the deliberation or premeditation shall have existed for any particular length of time. Their existence is discerned from the facts of the case. *E.g., Gladden v. State,* 273 Md. 383, 387, 330 A.2d 176 (1974); *Robinson v. State,* 249 Md. 200, 208–09, 238 A.2d 875, *cert. denied,* 393 U.S. 928, 89 S.Ct. 259, 21 L.Ed.2d 265; *Chisely v. State,* 202 Md. 87, 106–07, 95 A.2d 577 (1953). If the killing results from a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder. *Wilson v. State,* 261 Md. 551, 565, 276 A.2d 214 (1971); *Hyde v. State,* 228 Md. 209, 215–216, 179 A.2d 421 (1962), [*cert. denied,* 372 U.S. 945, 83 S.Ct. 938, 9 L.Ed.2d 970 (1963)]." *Tichnell v. State,* 287 Md. 695, 717–18, 415 A.2d 830, 842 (1980) (*Tichnell I*).

In *Taylor v. State,* 226 Md. 561, 174 A.2d 573 (1961), we found sufficient time for deliberation and premeditation during the time the defendant carried the weapon from one room to another. In this case it would appear that appelant did not bring the murder weapon (kitchen knife) into the house, and thus may not have had a plan to kill at entry; it is also clear, however, that the knife was not merely fortui-

---

**8.** *People v. Anderson,* 70 Cal.2d 15, 73 Cal.Rptr. 550, 447 P.2d 942 (1968) (en banc); *People v. Hoffmeister,* 394 Mich. 155, 229 N.W.2d 305 (1975); *Austin v. United States,* 382 F.2d 129 (D.C.Cir.1967); *Belton v. United States,* 382 F.2d 150 (D.C.Cir.1967); *Hemphill v. United States,* 402 F.2d 187 (D.C.Cir.1968).

tously close at hand. The evidence was that the knife had previously been washed and placed on the kitchen drainboard; the killing, however, took place at the stairs to an upper floor some distance from the kitchen. Obviously the appellant had to have obtained the knife in the kitchen, after his entry into the house, and carried it with him; or gone and gotten the knife at a later time, and returned to the stairs to use it. In either case there was sufficient time for deliberation and premeditation.

Moreover, this Court has found sufficient time for reflection and decision where there is an interval between fatal blows or where the assault occurs over a protracted period of time. In *Chisely, supra,* the firing of two or more shots separated by an interval of time was sufficient evidence of deliberation and premeditation for the jury. In *Kier v. State,* 216 Md. 513, 140 A.2d 896 (1958), the victim was beaten with an ornamental iron horse and a sword for a protracted period of time. "Then the assailant procured or produced a butcher knife which he plunged into her body not once but twice." *Id.* at 523, 140 A.2d at 900. We found the protracted period of time (together with the stabbings) was ample evidence to justify a conclusion that the killing was premeditated. Similarly, in *Robinson v. State,* 249 Md. 200, 238 A.2d 875, *cert. denied,* 393 U.S. 928, 89 S.Ct. 259, 21 L.Ed.2d 265 (1968), we found an "abundance of evidence" to support a verdict of premeditated murder, *id.* at 209, 238 A.2d at 881, where there was evidence of a great variety of stab wounds, defense wounds, bruises and scrapes about the body, as well as the infliction of a final wound after death.

In this case there was evidence of a protracted assault and an effort by the victim to defend herself. Twenty eight stab wounds were inflicted to various parts of the victim's body. Some of these wounds were defense-type wounds found on the victim's hands.

When this Court is required to review the sufficiency of the evidence to support a criminal conviction, we follow the standard enunciated in *Jackson v. Virginia,* 443 U.S. 307,

99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). *Tichnell v. State,* 287 Md. 695, 415 A.2d 830 (1980). The critical inquiry on review is to "determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt." 443 U.S. at 318, 99 S.Ct. at 2788, 61 L.Ed.2d at 573. However, the Court is not required to " 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt.' [Citations omitted]. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 318–19, 99 S.Ct. at 2789, 61 L.Ed.2d at 573 (emphasis in original).

▉ Given this standard we believe the evidence here was sufficient. In our view, the jury was entitled to conclude that the time during which appellant carried the knife from the kitchen to the stairway, compounded by the protracted nature of the assault, was sufficient time for him to have chosen, after thought and deliberation, to kill. Therefore, we find no merit to this contention.

### (ii)

The basis for appellant's second argument is that the evidence of his fingerprints found on glass broken from the basement door (the point of entry), and the evidence that he pawned the items taken during the robbery, is insufficient to show his criminal agency. We disagree.

▉ We stated the rule as to fingerprints in *McNeil v. State,* 227 Md. 298, 176 A.2d 338 (1961):

"It is generally recognized that fingerprint evidence found at the scene of a crime must be coupled with evidence of other circumstances tending to reasonably exclude the hypothesis that the print was impressed at a time other than that of the crime." *Id.* at 300, 176 A.2d at 339.

The Court of Special Appeals has construed the evidence of other circumstances required by *McNeil* to include "circumstances such as the location of the print, the character of the

place or premises where it was found and the accessibility of the general public to the object on which the print was impressed." *Lawless v. State,* 3 Md.App. 652, 659, 241 A.2d 155, 159–60 (1968). That court has consistently applied these factors to cases dealing with fingerprint evidence. However, this Court has not had occasion to apply the threefold test enunciated in *Lawless* until this time. We agree with *Lawless,* and will apply the factors identified there to the facts of the instant case.

We find that the circumstances surrounding the fingerprints found on the glass broken from the basement door tend to exclude the hypothesis that the print was impressed at a time other than that of the crime. The house was a private residence not accessible to the general public. The basement door was located at the back of the house. By the location of the basement door and the fingerprints on the broken glass it was a rational inference that appellant was there unlawfully. There was no evidence that appellant was anything but a stranger to the premises. Appellant offered no evidence to the contrary. Mrs. Sorrell testified that the basement door was locked and the glass was intact on the morning of her mother's murder. Susan Sorrell testified that the basement door was locked and the glass intact that same afternoon. We think, therefore, that there was sufficient evidence from which the jury could "reasonably exclude the hypothesis that the print was impressed at a time other than that of the crime." *McNeil, supra,* 227 Md. at 300, 176 A.2d at 339.

Eight days after the murder appellant pawned items taken from the Sorrell home. Appellant concedes that possession of stolen property, absent a reasonable explanation for possession, is evidence that the possessor stole the property. *Lewis v. State,* 225 Md. 474, 475–76, 171 A.2d 244, 245 (1961). Appellant offered no reasonable explanation for having the property in his possession. However, he argues that these items were easily transferable and that, therefore, an equally plausible inference is raised that he was merely the possessor of stolen goods and not the thief. We

find this argument to be without merit. The verdict is not subject to challenge merely because the jury might have drawn another inference. *United States v. Elsbery,* 602 F.2d 1054, 1057 (2d Cir.), *cert. denied,* 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979). "Further, it is the exclusive function of the jury to . . . resolve evidentiary conflicts and draw reasonable inferences from proven facts." *United States v. Ramirez-Rodriquez,* 552 F.2d 883, 884 (9th Cir. 1977); *United States v. Fitzharris,* 633 F.2d 416, 422 (5th Cir.1980), *cert. denied,* 451 U.S. 988, 101 S.Ct. 2325, 68 L.Ed.2d 847 (1981). Reviewing the evidence in the light most favorable to the prosecution we find the evidence offered by the state and the inferences properly drawn therefrom amply supported a finding of criminal agency. There were attendant circumstances to show that the fingerprints were affixed at the time of the murder, as well as evidence that the items taken during the crime were in his possession after the crime was committed.

(d)

■ Colvin next contends that trial counsel's representation was so inadequate that he was denied his constitutional right to the effective assistance of counsel. Furthermore, Colvin claims he objected to the quality of his representation at trial, and the record clearly reflects counsel's incompetency.

We believe what was said by Judge Digges for the Court in *Johnson v. State,* 292 Md. 405, 439 A.2d 542 (1982), is dispositive of this argument:

"Moreover, under the settled rules of appellate procedure, a claim of ineffective assistance of counsel not presented to the trial court generally is not an issue which will be reviewed initially on direct appeal, *Berndt v. Warden,* 240 Md. 701, 213 A.2d 471 (1965); *State v. Zimmerman* [261 Md. 11, 273 A.2d 156], *supra; see White v. State* [17 Md.App. 58, 299 A.2d 873], *supra; Bailey v. State,* 6 Md.App. 496, 252 A.2d 85 (1969); *Harris v. State* [2 Md.App. 408, 234 A.2d 781], *supra; see also* Md.Rules 885,

1085, although competency of counsel may be raised for the first time at a section 645A post conviction proceeding. *Davis v. State* [285 Md. 19, 400 A.2d 406], *supra; see Curtis v. State,* 284 Md. 132, 395 A.2d 464 (1978). Upon such a collateral attack, there is presented an opportunity for taking testimony, receiving evidence, and making factual findings concerning the allegations of counsel's incompetence. *Wilson v. State,* 284 Md. 664, 675, 399 A.2d 256, 262 (1979); *see* Md.Rule BK 44. By having counsel testify and describe his or her reasons for acting or failing to act in the manner complained of, the post conviction court is better able to determine intelligently whether the attorney's actions met the applicable standard of competence. Where, as here, the record sheds no light on why counsel acted as he did, direct review by this Court would primarily involve 'the perilous process of second-guessing' *People v. Miller,* 7 Cal.3d 562, 102 Cal.Rptr. 841, 848, 498 P.2d 1089, [1096] (1972), perhaps resulting in an unnecessary reversal in a case where sound but unapparent reasons existed for counsel's actions. Consequently, we leave consideration of Johnson's ineffective representation claim to the circuit court upon post conviction proceeding where there can be a studied evaluation of a proper record should appellant choose to pursue the matter. *See, e.g., Jones v. Warden,* 244 Md. 720, 224 A.2d 274 (1966); *Davis v. State,* 285 Md. 19, 36–37, 400 A.2d 406, 414–15 (1979); *see* Md.Rule BK 45b." *Johnson, supra,* at 434–35, 439 A.2d at 559.

For these reasons this issue is best raised under post conviction procedures if Colvin so desires.

### (3)

■ Because he was not present when his motion for a new trial was heard, Colvin argues there was error committed. We see no merit to this argument and reject it.

In *Ash v. State,* 238 Md. 317, 208 A.2d 691 (1965), we held that a hearing on a motion for a new trial is not part of the trial of the accused as contemplated by statutory and consti-

tutional provisions. *Id.* at 320, 208 A.2d at 693. Nevertheless, appellant asserts his presence was required because one of the issues involved the racial composition of the jury venire, an issue which he had raised pro se at the trial and "he may well have had additional information to offer to the court." Therefore, he argues, under our holding in *Hughes v. State,* 288 Md. 216, 421 A.2d 69 (1980), his absence at this stage of the proceedings was prejudicial.

In *Hughes,* we held that a defendant had the right to be present when the administrative judge made his determination as to whether or not any extraordinary cause was shown which would justify a continuance. It was made clear in *Hughes* that under the facts of that case the right to a fair hearing was thwarted by the absence of the defendant. *Id.* at 229, 421 A.2d at 76. The hearing in *Hughes* involved the necessity of making factual determinations. All of the relevant information would not have necessarily been known by the defendant's attorney, but would have been by the defendant. Therefore, his presence was required to assure fundamental fairness.

In the instant case there was no proffer of any additional facts Colvin could have presented at the motion hearing or even at the appellate level. This hearing was entirely collateral and merely consisted of legal argument which was within counsel's expertise. Thus, we cannot say that fundamental fairness required appellant's presence in this case.

(4)

Colvin next argues that "because there is 'no principled way to distinguish this case, in which the death penalty was imposed, from the many cases in which it was not,' appellant's death sentence must be vacated." (Quoting *Godfrey v. Georgia,* 446 U.S. 420, 433, 100 S.Ct. 1759, 1767, 64 L.Ed.2d 398, 409 (1980)). We disagree.

Under Maryland Code (1957, 1982 Repl.Vol.), Article 27, § 414, we are required to determine:

"(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;

(2) Whether the evidence supports the jury's or court's finding of a statutory aggravating circumstance under § 413(d);

(3) Whether the evidence supports the jury's or court's finding that the aggravating circumstances are not outweighed by mitigating circumstances;  and

(4) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Colvin does not contend, nor do we find from the record, that the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Furthermore, from our review of the record, we conclude the evidence supports the finding by the sentencing authority, of the statutory aggravating factor of murder committed while committing robbery. The evidence showed that jewelry was taken from the Sorrell residence at the time of the murder. These items were subsequently pawned by appellant. Additionally, the victim's wallet was found open with "absolutely nothing in it." These facts clearly establish the finding of an aggravating circumstance under § 413(d)(10). Moreover, we conclude from our record review that this aggravating circumstance was not outweighed by any mitigating circumstance (the sentencing jury found none).

In answer to Colvin's contention that his case cannot be distinguished from cases in which the death penalty was not imposed we note, preliminarily, that there is no federal constitutional requirement of proportionality review in every case in which the death penalty is imposed. *Pulley v. Harris,* —— U.S. ——, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Nevertheless, this Court is required to conduct such review by state legislative mandate.

Article 27, § 414(e)(4), mandates that the Court, in considering the imposition of the death sentence, determine

"[w]hether the sentence of death is excessive or dispropor-tionate to the penalty imposed in *similar* cases, considering both the crime and the defendant." [Emphasis supplied.] In *Tichnell v. State,* 297 Md. 432, 468 A.2d 1 (1983) (*Tichnell III*), we thoroughly discussed this Court's function in fulfill-ing its legislative mandate to conduct a proportionate review of death sentences, and found our review avoids the "arbi-trary or capricious imposition of the death penalty." *Id.* at 466, 468 A.2d at 18; *Calhoun v. State,* 297 Md. 563, 610, 468 A.2d 45, 67 (1983).

Based on the thorough review of Supreme Court cases in *Tichnell III,* we find appellant's contention to be unfounded under this Court's holdings in *Tichnell III* and *Calhoun.* We deem these cases to be dispositive of this issue.

### (a)

### *Proportionality Review*

In *Tichnell III,* this Court stated we would permit the defendant to bring to this Court's attention cases similar to the case then under scrutiny for us to take into account in the exercise of our proportionality review function. 297 Md. at 466, 468 A.2d at 18. However, in the instant case appellant seeks to have our proportionality review encom-pass felony murder cases without regard to the nature of the crime, which in our view runs counter to the legislative mandate to review "similar cases." While murder is mur-der, the circumstances surrounding a particular murder may very well differ from other types of murder to the extent that one may not be said to be similar to the other. This is the situation in the instant case.[9] In our judgment the

---

9. We have reviewed those cases submitted to us by appellant that involved murders committed during the course of robberies and find them dissimilar:

*Bryan Keith Quickley:* Quickley was sentenced to life for a murder committed during the robbery of a store. The sentencing authority found one aggravating circumstance, that the murder was committed while committing or attempting to commit robbery. It found two mitigating circumstances: the youthful age of the defendant at the

circumstances of this case should be compared with other cases involving murder committed during the course of breaking into a home and therein committing robbery and not with cases of felony murder involving other robbery situations.

We have reviewed those reports submitted by trial judges, pursuant to Rule 772A, in each of Maryland's capital sentencing proceedings and have selected five which we deem to be "similar" within the framework of Article 27, § 414(e)(4).

*Ronald Leroy Johnson:* Johnson was sentenced to life following a court sentencing proceeding for bludgeoning to death his great aunt during the course of an attempted robbery in her home. The sentencing judge found that the latter was shown beyond a reasonable doubt. It was also shown by a preponderance of the evidence that three mitigating circumstances existed: the defendant had not previously been found guilty or charged with a crime of violence;

---

time of the crime; and that the defendant was at the borderline range of intelligence with severe intellectual limitations both at the verbal and performance measured levels. The defendant had no prior criminal record. The mitigating circumstances were found to outweigh the aggravating circumstances by a preponderance of the evidence.

*James Thomas Porter:* Porter was sentenced to life for a murder committed during the robbery of a gas station. The court sentenced Porter to life imprisonment when the jury became deadlocked after a reasonable time of deliberation.

*Gary Allen Miller:* Miller was sentenced to life imprisonment for murder. The sentencing court found one aggravating circumstance, that the defendant committed the murder while committing or attempting to commit robbery. The court found several mitigating circumstances: the defendant had no prior record of a crime of violence; the victim was a participant in the defendant's conduct or consented to the act which caused the victim's death; the murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, or intoxication; the act of the defendant was not the sole proximate cause of the victim's death. The mitigating circumstances were found to outweigh the aggravating circumstances.

that Johnson acted under substantial duress, domination or provocation of another person, but not so substantial as to constitute a complete defense to the prosecution; and the murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, or intoxication. The sentencing judge concluded, by a preponderance of the evidence, that the mitigating circumstances outweighed the aggravating circumstance and, accordingly, sentenced the defendant to life.

*Dean Hugh Oliver:* Having been found guilty of murder and felony murder committed during the course of the burglary of a home, the same jury subsequently sentenced Oliver to life. An examination of the jury's findings and sentencing determination discloses that the jury found no aggravating circumstance and apparently did not consider mitigating circumstances. The report does reflect that there were two persons involved in the crime although the second person blamed Oliver for the murder.

*Lawrence Johnson:* Johnson was found guilty by a jury of premeditated first degree murder, daytime housebreaking and robbery. A sentence of death was imposed for the murder conviction.[10] The convictions stemmed from a daytime housebreaking during the course of which Johnson and Dwayne Mayers encountered a 78 year old female, who was brutally beaten, stomped, kicked, tied and then strangled to death. Dwayne Mayers was sentenced to life imprisonment for his participation in this offense. The sentencing jury found one aggravating circumstance, that the defendant committed the murder while committing or attempting to commit robbery. The jury found two mitigating circumstances: the act of the defendant was not the sole proximate cause of the victim's death; and the co-defendant received a

---

**10.** A new sentencing proceeding was granted by the trial court. On February 18, 1984 a jury reimposed the death sentence.

life sentence. However, in this instance the jury did not find that the mitigating circumstances outweighed the aggravating circumstances by a preponderance of the evidence. The report of the trial judge in Johnson's case indicates that he had a prior conviction for daytime housebreaking, two housebreakings as a juvenile, and a first degree murder conviction for which, on remand from the reversal of his death penalty, life imprisonment was imposed. To some extent Johnson's background parallels that of the instant case.

*Dwayne T. Mayers:* An elderly female was strangled to death in her home during the course of a breaking and entering. Mayers was convicted by a jury of felony murder and subsequently sentenced by the same jury to life. That jury found one aggravating circumstance, murder during robbery. It also found defendant had no previous conviction for or charge of a crime of violence; that the murder was committed while the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental incapacity, mental disorder, emotional disturbance, or intoxication; and that the defendant was of youthful age.

*Glen Sturgis:* This defendant, along with another, broke into a home intending to burglarize it and, while therein, the victim, Mrs. Bridell, returned home. She was kidnapped and ultimately shot by each of the intruders. A jury found Sturgis guilty of murder and other offenses. The same jury was elected by the defendant for sentencing and failed to agree thereon; a life sentence was thus imposed. There was evidence of two aggravating circumstances: the victim was taken as a hostage; and the murder was committed during the course of a robbery. The trial judge also reported that there was evidence raised that the defendant was not the sole proximate cause of the victim's death, and that the defendant was of youthful age at the time of the crime. Additionally, he had cooperated with the police and assisted

in locating the body. The co-defendant received a life sentence on a plea of guilty to first degree murder.

By contrast to the above, the defendant here was 36 years old at the time of the offense, with a record of convictions for burglary, larceny, storehouse breaking, and assault stretching back to 1960. Ronald Johnson and Dwayne Mayers had not previously been found guilty or charged with a crime of violence. Additionally, Dwayne Mayers and Glen Sturgis were found to be of youthful age at the time of the crime. Furthermore, the record reveals no evidence of physical or mental problems or that the defendant was under the influence of alcohol or drugs at the time of the offense. This is in contrast to the findings in Ronald Johnson's case, as well as Dwayne Mayers'. The jury in the instant case found one aggravating circumstance and no mitigating circumstance. In the cases of Ronald Johnson and Dwayne Mayers there was one aggravating factor but three mitigating circumstances. The jury found no aggravating circumstances in Dean Oliver's case. There was evidence of two aggravating circumstances in Glen Sturgis's case, but several mitigating circumstances were also found to be present.

In our view, the jury's imposition of the death sentence in this case was not an aberration.

Having fulfilled our mandated proportionality review function, we hold that the death sentence imposed on the defendant was neither excessive nor disproportionate to the penalty imposed in similar cases in Maryland, considering both the crime and the defendant.

(5)

Colvin finally argues that the Maryland death penalty statute is unconstitutional because it violates either the United States Constitution or the Maryland Constitution. His attack focuses on seven alleged deficiencies:

(a) the statute, because it exposes a majority of first degree murderers to the death penalty, does not reserve this sanction for only "a small number of extreme cases"

as required by the Supreme Court in *Godfrey v. Georgia,* 446 U.S. 420, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980);

(b) the statute mandates the death penalty upon the finding of an aggravating circumstance and no mitigating circumstance;

(c) the death penalty for a felony murder conviction is disproportionate;

(d) the statute unconstitutionally placed upon the accused the burden of proving the existence of a mitigating circumstance;

(e) Articles 16 and 25 of the Maryland Constitution are violated by the statute because it permits punishment which is cruel and unusual;

(f) the statute is constitutionally defective because of the discretion vested in the sentencing authority;

(g) that the statute is unconstitutional as applied in the instant case.

## (a)

Colvin contends that Sec. 413(d)(10) [11] fails to restrict the death penalty to exceptional cases. He argues that over half of the first degree murder convictions reviewed and reported by the Court of Special Appeals since January, 1976, were based on felony murder and thus the statute cannot be deemed to reserve the death penalty for only a small number of extreme cases. However, we find appellant ignores the legislative intent to restrict the death penalty to exceptional cases by providing certain specific requirements. Most important, to address appellant's argument, is the

---

11. Art. 27, § 413(d)(10) states:
   "(d) *Consideration of aggravating circumstances.*—In determining the sentence, the court or jury, as the case may be, shall first consider whether, beyond a reasonable doubt, any of the following aggravating circumstances exist:
   
   \*      \*      \*      \*      \*      \*
   
   (10) The defendant committed the murder while committing or attempting to commit robbery, arson, or rape or sexual offense in the first degree."

specific enumerated felonies in section 413(d)(10). This section does not encompass all of the felonies which would support a first degree murder verdict. Additionally, section 413(e)(1) requires that the defendant be a principal in the first degree.[12] Although accomplices could be convicted of felony murder they would be exempt under section 413(e)(1) if they did not actually commit the murder. Therefore, the application of the statute is limiting, contrary to what appellant contends. Moreover, we are not told which of these cases reviewed and reported by the Court of Special Appeals involved those offenses specifically set out in § 413(d)(10), robbery, arson, or first degree rape or sexual offense, or which of those convicted were principals in the first degree. Thus it simply is impossible to draw any conclusion from the statistics such as Colvin would have us do.

Further, as we stated in *Tichnell I, supra,* "the imposition of the death penalty is limited to cases in which the sentencing authority finds at least one aggravating circumstance. The sentencing authority is required to consider the existence of mitigating circumstances. A sentence of death may be imposed *only* if the mitigating circumstances do not outweigh the aggravating circumstances." *Id.* 287 Md. at 729, 415 A.2d at 848 (emphasis supplied). This statutory scheme is therefore designed to limit the imposition of the death penalty to a "small number of extreme cases." *Gregg v. Georgia,* 428 U.S. 153, 182, 96 S.Ct. 2909, 2929, 49 L.Ed.2d 859, 879 (1976), as required by Supreme Court decisions.

(b)

Next, Colvin argues that the statute mandates the imposition of the death penalty in a felony murder situation, since the factfinder will automatically find the existence of

12. Only one exception, not applicable to this appeal, is found in the statute. If the defendant "engaged or employed another person to commit the murder and the murder was committed pursuant to an agreement or contract for remuneration or the promise of remuneration," the defendant could be eligible for the death penalty. Article 27, § 413(d)(7).

the felony murder aggravating factor at sentencing. Aside from the fact that in this case Colvin was also found guilty of premeditated murder, and that in *Tichnell I, supra,* we found the statute facially constitutional, we disagree with his conclusion. *See Calhoun, supra,* 297 Md. at 629, 468 A.2d at 77 (felony murder found to be a constitutional aggravating factor).

What appellant fails to consider is the entire statutory scheme which must be utilized by the jury in arriving at its verdict. The jury must first determine whether the state has proved any of the aggravating circumstances beyond a reasonable doubt. If so found it is the right of the sentencing body to then find any mitigating factors which may be found to outweigh any aggravating circumstance, in which event the statute mandates a life sentence. This type of procedure was "noted with approval by the United States Supreme Court in *Jurek v. Texas,* 428 U.S. 262, 271 n. 6, 96 S.Ct. 2950, 2956 n. 6, 49 L.Ed.2d 929 [938 n. 6] (1976)." *Houston v. State,* 593 S.W.2d 267, 277 (Tenn.), *cert. denied,* 449 U.S. 891, 101 S.Ct. 251, 66 L.Ed.2d 117 (1980). This procedure allows the jury to weigh all the circumstances in determining what sentence should be imposed. "That it is not a mandatory death penalty statute is clear. Because it allows for a broad consideration of mitigating circumstances, it plainly withstands scrutiny under *Woodson v. North Carolina* [428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)], *supra,* and *Roberts v. Louisiana* [428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976)], *supra.*" *Tichnell I, supra* 287 Md. at 728, 415 A.2d at 848. The death penalty does not automatically flow from a finding of one aggravating factor beyond a reasonable doubt. That the jury did impose the death penalty in this case after finding robbery as an aggravating circumstance was a result reached because the jury found no mitigating circumstances to weigh against this aggravating circumstance. The sentencing authority followed the procedure set forth in Article 27, § 413. We find no error.

(c)

Colvin further argues that the imposition of the death penalty for felony murder is disproportionate to the crime. In *Coker v. Georgia,* 433 U.S. 584, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977), the Supreme Court emphasized that the death penalty was unconstitutional when it was disproportionate to the nature of the crime. The Court also noted, however, that it is established that the death penalty is not "an unacceptable mode of punishment . . . at least for murder. . . ." *Id.* at 591, 97 S.Ct. at 2866, 53 L.Ed.2d at 989. As Colvin was convicted of premeditated murder as well as felony murder, his argument is inapplicable to the facts of this case.

Moreover, in our view, the imposition of a sentence of death in a felony murder case is not necessarily excessive and unconstitutional. Each case must be evaluated on the culpability of that particular defendant. The Supreme Court requires " 'individualized consideration as a constitutional requirement in imposing the death sentence.' " *Enmund v. Florida,* 458 U.S. 782, 797, 102 S.Ct. 3368, 3377, 73 L.Ed.2d 1140, 1152 (1982) (citation omitted).

There are, however, general principles by which we can measure the constitutionality of a death penalty statute. In *Coker,* the Supreme Court stated:

"Under Gregg, a punishment is 'excessive' and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." *Id.* 433 U.S. at 592, 97 S.Ct. at 2866, 53 L.Ed.2d at 989.

The Maryland statute avoids both of these objections. As we stated previously, the Maryland statute limits the death sentence to those who actually commit murder, with only one exception for contract murder. Article 27, § 413(e)(1). *But see Enmund v. Florida, supra,* 458 U.S. at 797, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152 (imposition of death penalty

when one does not kill or attempt to kill, or have any intention of participating in or facilitating a murder is an "excessive penalty"); *Coker, supra,* 433 U.S. at 592, 97 S.Ct. at 2861, 53 L.Ed.2d at 982 (imposition of death penalty for the rape of an adult woman "is grossly disproportionate and excessive punishment"). Thus, this limiting feature of the Maryland statute, as well as the mandatory review set forth in Article 27, § 414(e)(4), assures that the sentence will not be out of proportion to the severity of the crime.

The second requirement under *Gregg* is to measure the punishment against acceptable goals. Two acceptable goals of punishment, retribution and deterrence of capital crimes by prospective offenders, are furthered when the death penalty is given to the "trigger man" in a felony murder case. Speaking to the value of capital punishment, the Supreme Court observed:

" 'Retribution is no longer the dominant objective of the criminal law,' *Williams v. New York,* 337 US 241, 248, 93 L Ed 1337, 69 S Ct 1079 [1083] (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men. *Furman v. Georgia,* 408 US [238] at 394–395, 33 L Ed 2d 346, 92 S Ct 2726 [at 2806–2807] (Burger, C.J., dissenting); id., at 452–454, 33 L Ed 2d 346, 92 S Ct 2726 [at 2835–2836] (Powell, J., dissenting); *Powell v. Texas,* 392 US [514] at 531, 535–536, 20 L Ed 2d 1254, 88 S Ct 2145 [at 2153, 2155–2156] (plurality opinion). Indeed, the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death.

*   *   *   *   *   *

The value of capital punishment as a deterrent of crime is a complex factual issue the resolution of which properly rests with the legislatures, which can evaluate the results of statistical studies in terms of their own local conditions and with a flexibility of approach that is not available to the courts. *Furman v Georgia,* supra [408 U.S.] at 403–

405, 33 L Ed 2d 346, 92 S Ct 2726 [at 2810–2811] (Burger, C.J., dissenting). Indeed, many of the post-Furman statutes reflect just such a responsible effort to define those crimes and those criminals for which capital punishment is most probably an effective deterrent."
*Gregg v. Georgia,* 428 U.S. 153, 183–84, 186, 96 S.Ct. 2909, 2930–31, 49 L.Ed.2d 859, 880–882 (1976).

That the Maryland legislature seeks to deter felons from murdering during the course of committing other crimes is clear. The threat that the death penalty will be imposed for murder in these situations may well act as a deterrent. Unlike the situation in *Enmund* where the Supreme Court found it would not be a deterrent for "one who does not kill and has no intention or purpose that life will be taken," 458 U.S. at 797, 102 S.Ct. at 3377, 73 L.Ed.2d at 1152, in Maryland the legislature seeks to deter, and the ultimate sanction is only available for, those who do actually kill during the commission of a felony, or engage another to kill for remuneration.

As we stated previously, Colvin was convicted of first degree premeditated murder as well as felony murder, so it would serve no purpose to justify his punishment for the felony murder alone; although this is the sole basis for his argument.

### (d), (e), (f)

Appellant argues that the statute unconstitutionally places the burden of proof to show mitigation on the accused; that the imposition of the death penalty violates Article 16 and 25 of the Maryland Declaration of Rights; that the sentencing jury has too much discretion; that the sentencing jury does not have sufficient discretion.

These arguments were raised, considered, and rejected in *Tichnell I* and, as we stated in *Johnson v. State,* 292 Md. 405, 436, 439 A.2d 542, 560 (1982), as regards the first two contentions:

"Both arguments presented here were thoroughly considered and rejected, however, in . . . *Tichnell v. State,*

287 Md. 695, 720–34, 415 A.2d 830, 843–50 (1980), and we deem the matter to be settled."

Further, we stated, "the statute complies with three general methods of guiding the discretion vested in the sentencing authority under *Gregg, Proffitt* [*v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)], and *Jurek*." *Tichnell I, supra* 287 Md. at 728–729, 415 A.2d at 848. We deem this matter, likewise, to be settled.

(g)

■■ Finally Colvin argues that the statute is unconstitutional, as applied in the instant case, because a death penalty may not be imposed on a felony murder theory when the defendant's conviction was based on the same evidence of felony murder. He relies on *State v. Cherry,* 298 N.C. 86, 257 S.E.2d 551 (1979), *cert. denied,* 446 U.S. 941, 100 S.Ct. 2165, 64 L.Ed.2d 796 (1980), to support this contention. We believe this reliance to be misplaced.

In *Cherry* the defendant was convicted of first degree felony murder. At the guilt determination phase of the trial the jury was not even instructed on premeditation and deliberation. In reversing the death penalty and remanding for a new sentencing trial, the North Carolina Supreme Court held:

"Once the underlying felony has been used to obtain a conviction of first degree murder, it has become an element of that crime and may not thereafter be the basis for additional prosecution or sentence. *Neither do we think the underlying felony should be submitted to the jury as an aggravating circumstance in the sentencing phase when it was the basis for, and an element of, a capital felony conviction.*" (Emphasis added.) *State v. Cherry,* 257 S.E.2d at 567–68.

However, the Court further stated:

"Nothing we have said herein should be construed to foreclose consideration of the aggravating circumstance found in G.S. 15A–2000(e)(5) [13] when a murder occurred

---

**13.** N.C.Gen.Stat. § 15A–2000(e)(5) (1977), states:

during the commission of one of the enumerated felonies but where the defendant was convicted of first degree murder on the basis of his premeditation and deliberation. In such case, the jury should properly consider that aggravating circumstance in determining sentence." *Id.* at 568.

In the instant case, of course, Colvin was convicted of premeditated murder. Therefore, even under *Cherry,* consideration of the underlying felony as an aggravating circumstance was proper. We further find that the Supreme Court has implicitly approved the identical application of the felony of robbery committed as part of the act of murder as a valid aggravating circumstance to support the imposition of the death penalty. *See Proffit v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976).

The issue decided in *Cherry* is not presented by the facts of this case. Therefore, we do not now decide whether the underlying felony should be submitted to the jury as an aggravating circumstance in the sentencing phase when it was the basis for a capital felony conviction.

JUDGMENT AFFIRMED, WITH COSTS.

DAVIDSON, Judge, dissenting:

The majority here determines that "the appellant was at best seeking 'hybrid' representation, not making a statement from which the court could reasonably conclude that he desired self-representation." Consequently, the majority concludes that "the predicate needed to trigger the threshold inquiry required by *Snead* or that required by Rule 723 c was missing." I do not agree. In my view, the accused's

---

"Aggravating Circumstances.—Aggravating circumstances which may be considered shall be limited to the following:

\* \* \* \* \* \*

(5) The capital felony was committed while the defendant was engaged, or was an aider or abettor, in the commission of, or an attempt to commit, or flight after committing or attempting to commit, any robbery, rape, arson, burglary, kidnapping, or aircraft piracy or the unlawful throwing, placing, or discharging of a destructive device or bomb."

statement here was sufficient to trigger that inquiry. Accordingly, I respectfully dissent.

An accused in a criminal prosecution has the constitutional right to proceed without counsel. *State v. Renshaw,* 276 Md. 259, 267, 347 A.2d 219, 225 (1975); *see also Faretta v. California,* 422 U.S. 806, 818, 95 S.Ct. 2525, 2532, 45 L.Ed.2d 562 (1975). In *Snead v. State,* 286 Md. 122, 127, 406 A.2d 98, 101 (1979), we considered "how the right to self-representation must be asserted." In establishing the minimum "declaration" sufficient to constitute an assertion of the right to self-representation, we said:

"As we see it, such a declaration serves to alert the trial judge that further inquiry may be necessary. Therefore, *any statement by the defendant from which the court could reasonably conclude that the defendant desired self-representation would be sufficient.*" (Emphasis added.)

Thus, this Court in *Snead* established that it is not necessary for an accused to make an unequivocal statement indicating a desire to represent himself in order to trigger an inquiry by the trial court to determine whether the accused is entitled to exercise the right to self-representation.

Additionally, in *Snead,* this Court described the inquiry to be pursued by the trial court when the accused indicates, in a minimum "declaration," a desire to defend himself. There we said:

"When the defendant so indicates a desire to defend *pro se,* the court must, by appropriate inquiry, determine whether he 'truly wants to do so.' *Faretta,* 422 U.S. at 817 [95 S.Ct. at 2532]. This inquiry has two phases. First, the court should ascertain whether the defendant 'clearly and unequivocally' wants to defend himself. If a defendant makes known to the court, admitting of no doubt or misunderstanding, that he desires to represent himself, the right to do so has been properly asserted.

"Once the defendant has clearly and unequivocally declared his desire to proceed *pro se,* the second phase of the inquiry is triggered.

.   .   .   .   .

Rule 723 of the Maryland Rules of Procedure implements the constitutional mandates for waiver of counsel, and its provisions are mandatory. Section c of the Rule details the inquiry to be made '[w]hen a defendant indicates a desire or inclination to waive counsel. . . .' Thus, it is invoked when a defendant has properly asserted his right to defend *pro se* and governs phase two of the inquiry required to determine whether a defendant 'truly' desires to manage his own defense. In short, a defendant in a criminal prosecution who has properly asserted the right to defend himself and has, under our procedures, effectively waived the assistance of counsel, has the right to self-representation absolutely." *Snead,* 286 Md. at 127–28, 130, 406 A.2d at 101, 102 (citations omitted).

Thus, this Court established that when an accused makes a minimum "declaration" asserting the right to self-representation, the trial court must conduct an inquiry to determine whether the accused "clearly and unequivocally" wants to represent himself. If the trial court determines that the accused "clearly and unequivocally" wants to represent himself, the right to self-representation has been properly asserted. The trial court is then required to conduct an inquiry pursuant to Maryland Rule 723[1] to determine

---

1. Md.Rule 723 c provides:

"When a defendant indicates a desire or inclination to waive counsel, the court may not accept the waiver until it determines, after appropriate questioning on the record in open court, that the defendant possesses the intelligence and capacity to appreciate the consequences of his decision, and fully comprehends:

"1. The nature of the charges against him, any lesser included offenses, and the range of allowable penalties, including mandatory and minimum penalties, if any;

"2. That counsel can render important assistance to him in determining whether there may be defenses to the charges or circumstances in mitigation thereof, and in preparing for and representing him at trial;

"3. That even if the defendant intends to plead guilty, counsel may be of substantial assistance in developing and presenting information which could affect the sentence or other disposition;

whether the accused has competently and intelligently waived the right to assistance of counsel.

The record here shows, contrary to the majority's assertion, that the accused's statement was a minimum "declaration" sufficient to trigger the two-phase inquiry required by *Snead*. During a pretrial proceeding, the following colloquy took place:

"COURT: Now is there anything before you start to address the jury? Any ... any motions that—

"MR. PAYNE [Defense Counsel]: There were some motions, I think.

"COURT: What are they, sir?

"MR. PAYNE: Well, *Mr. Colvin has some proper person motions.*

"COURT: Alright." (Emphasis added.)

After a recess, the colloquy continued as follows:

"MR. PAYNE: Your honor, I believe *Mr. Colvin has some motions which involve proper person.*

"COURT: Hand them to the Court please. (Long pause) Pass them up to the Court. . . .

. . . . . . . . .

"DEFENDANT: ... At this time I'd like to speak about some motions that I drew up. *One of the motions* concerning *is the removal of my counsel,* for which I applied for in another court.

"COURT: Alright. What do you want to say about it?

"DEFENDANT: I already wrote ... already wrote the verses to the change of counsel. I believe that because of improper support, because of the nature of the charge, because the State has allowed in cases the State's Attorney .. the State, uh, uh counsel .. to be paid for representation of the defendant because I need the counsel of my choice to properly represent me in the nature of

---

"4. That if the defendant is found to be financially unable to retain private counsel, the Public Defender or the court would, if the defendant wishes, provide counsel to represent him."

this case. I ask that the State allow me to choose my counsel and reimburse him for his service.

"COURT: Anything else?

"DEFENDANT: *There's another motion concerning to be allowed to defend myself to a degree* if this case is àllowed to go on.

"COURT: Alright. Anything else?" (Emphasis added.)

Subsequently, the Assistant State's Attorney said:

"MR. LEVITZ [Assistant State's Attorney]: Before the jury comes in *I wonder if, in view of the defendant's remarks, an inquiry into Rule 723 would be appropriate? I'm not clear in my mind, Judge, whether the defendant has requested to represent himself or not.*" (Emphasis added.)

After denying the accused's motion for removal of his assigned Public Defender, the trial court concluded that the accused was requesting "hybrid representation" and consequently that a "Rule 723 inquiry" was unnecessary. Thereafter, the colloquy continued as follows:

"DEFENDANT: You spoke of a serious matter bringing about a change of counsel. At our last peer . . at our last motion hearing *we both* [the accused and the assigned Public Defender] *requested to be relieved of each other.* Mr. Payne can speak for the matter hisself now.

"COURT: Well, it's denied." (Emphasis added.)

In my view, the accused's statement that he desired "to be allowed to defend myself to a degree" was not a clear and unambiguous request for hybrid representation.[2] Rather, it

---

**2.** I do not agree with the majority that the fact that Colvin "stated to the court five times that he did not wish to 'fire' his attorney," supports the conclusion that the accused "was at best seeking 'hybrid' representation." These statements were made at a hearing held on 14 May 1981 in the Circuit Court for Baltimore County before Judge William R. Buchanan, Sr. At this hearing, the accused's motion for a change of venue was granted and the case was removed to the Circuit Court for Anne Arundel County.

The pretrial proceeding with which we are here concerned was held on 18 August 1981 in the Circuit Court for Anne Arundel County

was an equivocal statement that could reasonably support not only a conclusion that the accused requested "hybrid" representation but also a conclusion that the accused desired self-representation. Under these circumstances, the inquiry required by *Snead* was triggered.

The record here shows that the accused did not desire to be represented by his assigned Public Defender. Additionally, the accused made a request "to be allowed to defend myself to a degree." This request was not articulated in terms of a desire to act as co-counsel, to assist counsel, to himself conduct some particularized aspect of the trial, or to have counsel advise him during the course of the trial.[3]

---

before Judge F. Mackall Childs. There, notwithstanding the accused's 14 May 1981 statements that he did not then wish to "fire" his attorney, the accused initially expressed dissatisfaction with his assigned Public Defender and moved for "removal of my counsel." The accused did not at any time during the 18 August 1981 pretrial proceeding express a desire to retain his assigned Public Defender. Indeed, after the accused's motion "to defend myself to a degree" was denied, he again indicated that he did not desire to be represented by his assigned Public Defender and wanted him removed. In view of the accused's unequivocal statements that he desired the removal of his assigned Public Defender, made during the 18 August 1981 pretrial proceeding, his previous statements that he did not wish to "fire" his assigned Public Defender, made during the 14 May 1981 proceeding in another county before another judge, do not lend support to the conclusion that on 18 August 1981 he "was at best seeking 'hybrid' representation."

3. It is significant to note that ordinarily a request for "hybrid" representation is expressly articulated in terms of a desire:

   (1) to act as co-counsel, *United States v. Lang,* 527 F.2d 1264, 1265 (4th Cir.1975), *cert. denied,* 424 U.S. 920, 96 S.Ct. 1127, 47 L.Ed.2d 328 (1976); *United States v. Swinton,* 400 F.Supp. 805, 805 (S.D.N.Y.1975);

   (2) to assist in the defense, *United States v. Hill,* 526 F.2d 1019, 1023–24 (10th Cir.1975), *cert. denied,* 425 U.S. 940, 96 S.Ct. 1676, 48 L.Ed.2d 182 (1976);

   (3) to assist counsel, *Brasier v. Jeary,* 256 F.2d 474, 475 (8th Cir.1958);

   (4) to conduct some particularized aspect of the trial, *United States v. Dougherty,* 473 F.2d 1113, 1119–20 (D.C.Cir.1972); *United States v. Dellinger,* 472 F.2d 340, 407–08 (7th Cir.1972), *cert. denied,* 410 U.S. 970, 93 S.Ct. 1443, 35 L.Ed.2d 706 (1973); *United States v. Conder,* 423 F.2d 904, 907 (6th Cir.), *cert. denied,* 400 U.S.

Instead, the accused himself expressly articulated his request in terms of being "allowed to defend myself." [4] Moreover, even after the trial court determined that the accused was not entitled to "hybrid" representation, the accused again indicated that he did not desire to be represented by

---

958, 91 S.Ct. 357, 27 L.Ed.2d 267 (1970); *Duke v. United States,* 255 F.2d 721, 725–26 (9th Cir.1958); *Wilson v. State,* 44 Md.App. 318, 327, 408 A.2d 1058, 1063 (1979); *Beard v. State,* 42 Md.App. 276, 288, 399 A.2d 1383, 1390 (1979); or

(5) to have counsel provide advice during the course of the trial, *Lee v. Alabama,* 406 F.2d 466, 468–69 (5th Cir.1969); *Shelton v. United States,* 205 F.2d 806, 812–13 (5th Cir.1953).

In none of these cases was the request for "hybrid" representation expressly articulated in the terms used in this case—"to be allowed to defend myself to a degree."

4. In my view, the accused's affirmative request to be "allowed to defend myself" even when coupled with the phrase "to a degree" is as strong a declaration of a desire for self-representation as that made by the accused in *Snead.* In *Snead,* as here, the accused initially indicated a desire to replace his counsel with counsel of his choice. When that request was denied, the accused said, "I don't want no attorney then." *Snead,* 286 Md. at 126, 406 A.2d at .100. Thus, Snead never expressly stated that he wanted to represent himself. Although the Court of Special Appeals found that a desire for self-representation could not be inferred from Snead's statement, this Court found Snead's statement to be a minimum "declaration" sufficient to reasonably support a conclusion that he desired self-representation. *Snead,* 286 Md. at 131, 406 A.2d at 103.

The majority asserts that the "appellant's reliance on *Snead* is misplaced" because the appellant "did not seek to engage a private attorney; rather he desired to select his own attorney, and have that attorney reimbursed for services by the State." That fact, however, cannot serve as a basis for distinguishing *Snead* from the instant case. In *Snead,* this Court did not consider any question concerning an indigent accused's right to representation by counsel. Rather, the question presented was "whether Snead was 'denied his Sixth Amendment right of self-representation....'" *Snead,* 286 Md. at 125, 406 A.2d at 99. More particularly, the question was whether Snead's statement constituted a declaration sufficient to reasonably support a conclusion that he desired self-representation. Here, as in *Snead,* the question before this Court does not concern an indigent accused's right to representation by counsel. Rather, the question is whether Colvin was denied his right to self-representation. More particularly, the question is whether Colvin's statement constituted a declaration sufficient to reasonably support a conclusion that he desired self-representation. Thus, the majority's distinction is meaningless. Consequently, I do not agree with the majority that the "appellant's reliance on *Snead* is misplaced."

the assigned Public Defender. Indeed, he noted that not only he but also the assigned Public Defender recognized that the existing lawyer-client relationship was unsatisfactory, a factor that suggests that the accused had not been seeking "hybrid" representation because the necessary relationship for successful "hybrid" representation did not exist.

Additionally, defense counsel informed the trial court that the accused had prepared "some motions which involve proper person," thus suggesting that some of the accused's motions were requests for self-representation rather than for "hybrid" representation. More important, the Assistant State's Attorney recognized that the accused's statement could reasonably support a conclusion that the accused desired self-representation. On the basis of the record, there can be no question but that the accused's statement could reasonably support a conclusion that the accused desired self-representation.

Under the present circumstances, the accused's declaration was sufficient to alert the trial court that further inquiry was necessary. Consequently, the accused's statement constituted a declaration sufficient to require an inquiry to ascertain whether he truly and unequivocally wanted self-representation. That inquiry was never made by the trial court. Thus, the second phase of the inquiry governed by Md.Rule 723 c—whether the right to assistance of counsel was competently and intelligently waived—was not pursued.

The failure of the trial court to pursue the inquiry essential to a determination of the right to proceed without counsel necessitates reversal of the judgments.[5] *Snead,* 286 Md. at 131, 406 A.2d at 103. Accordingly, I would remand the case for a new trial.

---

**5.** In light of this conclusion, I need not consider the other issues addressed in the majority opinion.